**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF MISSISSIPPI**
**GREENVILLE DIVISION**

**CLYDE WENDELL SMITH,**
Petitioner,

v. **Case No. 4:17-CV-00087-SA**

**BURL CAIN,**
**COMMISSIONER, MISSISSIPPI DEPARTMENT OF CORRECTIONS**

and

**LYNN FITCH,**
**MISSISSIPPI ATTORNEY GENERAL**
Respondents.
_____________________________ /

**AMENDED PETITION FOR A WRIT OF HABEAS CORPUS**

Petitioner Clyde Wendell Smith[1], through undersigned counsel, hereby files this amended petition for a writ of habeas corpus under 28 U.S.C. § 2254, in accordance with this Court's February 16, 2026, Order. *See* Docs. 3, 84. Petitioner is in the custody of Respondents, where he is incarcerated at Mississippi State Penitentiary at MS Hwy 49 W, Parchman, MS 38738. His Prisoner Number is 44932. Petitioner alleges and states as follows:

[1] This Petition refers to Petitioner Clyde Wendell Smith as "Petitioner" or "Clyde," and refers to his brother/codefendant Jerome Pete Smith as "Jerome."

## Citations

This Petition cites to the clerk's trial papers as "C.P. __"; to the trial transcript as "R/__"; and to filings in this case as "Dkt __." All other citations are self-explanatory.

## Procedural History

This section cites from the Mississippi Supreme Court opinions on direct appeal, *Smith v. State*, 729 So. 2d 1191 (Miss. 1998) (*Smith I*); initial postconviction appeal, *Smith v. State*, 877 So. 2d 369 (Miss. 2004) (*Smith II*); and Clyde's application for leave to file a successive motion for postconviction appeal, *Smith v. State*, 410 So. 3d 1066 (Miss. 2025) (*Smith III*).

### A. Trial

On November 9, 1992, Clyde and Jerome were arrested for the murder of Johnny B. Smith (no relation to Clyde or Jerome). *Smith I*, at 1195, 1199. On November 12, 1992, Circuit Court Judge Gray Evans appointed attorneys Wallace Stuckey and Whitman Mounger to represent Clyde. C.P. at 8, 11. Attorneys Leman Gandy and Leland Jones were appointed to represent Jerome. C.P. at 14-15, 17. On February 12, 1993, Clyde and Jerome were formally indicted as co-defendants in Leflore County Circuit Court Cause No. 22,191 on capital murder charges. C.P. at 5-6. On February 24, 1993, both defendants were arraigned, pleading "not guilty." Supp. R., at 1-3. At the arraignment, Clyde was represented by Mr. Stuckey and Mr. Mounger. *Id*.

**i. Severance motion**

Clyde and Jerome filed motions for severance, asserting they had developed inconsistent and antagonistic defenses, which would be prejudicial if tried jointly. R/72, 75. On June 3, 1993, Judge Evans granted the severance motions. R/21. However, at a subsequent hearing, the trial court, having been informed that Clyde and Jerome disagreed with their respective attorneys, conducted an inquiry into their wishes. R/26-34. Both indicated they wished to be tried together. Judge Evans rescinded his severance order. *Id.*

**ii. Guilt-innocence phase**

The State introduced the following evidence in support of its case. Around 9:00 p.m., on November 7, 1992, Johnny B. Smith was shot and killed in his Sidon, Mississippi, liquor store. *Smith I*, at 1195. A cash register, extra cash drawer, and the victim's handgun[2] were missing. *Id.* A bottle of Seagram's gin in a brown bag was found on the counter. *Id.*

Motive for the robbery was supplied by Henry Bryant[3], boyfriend of Diane, Clyde's and Jerome's sister. Bryant testified that on the day of the shooting, he, Clyde, and Jerome drank beer and whiskey together until around 2:30 p.m. Clyde

[2] The handgun was a .32 or .38 caliber. The projectiles recovered at autopsy were later determined to be consistent with a .38 (and likely from a revolver).

[3] Bryant, who was dating Jerome's and Clyde's sister Diane, did not initially inculpate Clyde and Jerome. Two days after the murder, Bryant was arrested, handcuffed, fingerprinted, and put in jail. After two nights in jail, Bryant offered police a statement that was consistent with his trial testimony. He was then "unarrested" and allowed to go home. R/440.

told him he was "broke." R/426. Bryant told him, "Well, man, you might, you know, you know hard to get away when you do something like—you know—to do—try to get some money or rob somebody or something, you know." *Id*. According to Bryant, Clyde responded, "you know, you should, you know, go to a place where they ain't no whole lot of polices or something like that, you know." R/425-26; 427. Bryant testified that Jerome had a "shiny gun" a week earlier, and that he might have seen Jerome with the gun that morning when Jerome "raised his shirttail up." R/426- 27.

Several witnesses connected Clyde and Jerome to a red and white car. Clyde and Jerome's sister Dot testified that she loaned her 1975 white-on-red Ford Elite to her brothers. *Smith I*, at 1198. Leflore County Sheriff's Department Deputy Jerry Smith—the victim's brother—testified that while driving past his brother's store on patrol, he noticed a red car parked nearby with two occupants who slid down in their seats when he passed them.[4] *Id*. at 1196. Carolyn Pearce testified that around 2:00 a.m. the next morning, she, Clyde, and Jerome were in a red and white car in Indianola. *Id*. at 1197. Isola chief of police J.D. Roseman testified that between 3:00 a.m. and 3:15 a.m., he saw Clyde and Jerome in a "white-on-red 1972 Ford Elite," which he later learned was registered to their sister Dot. *Id*.

---

[4] Deputy Jerry Smith would later personally examine the car. He testified to recalling the car parked near his brother's store in great detail: small double windows, a burnt place near the exhaust, and a spot on the ground where the car was leaking transmission fluid. On cross-examination, he conceded that he did not recall seeing a reflective butterfly emblem that was on the back of the car.

Witnesses saw several people in the vicinity of the shooting. John Stewart, Lyndell Hunt, and Mack Crigler (the victim's cousin) testified that they drove by the liquor store between 9:00 p.m. and 10:00 p.m. *Id*. at 1196. Stewart and Hung noticed a red and white car parked nearby. *Id*. They all saw two or three men standing near the car, one of whom carried "an object with a cord dangling from it." *Id*. Kevin Smith, the victim's son, testified that two Black men ran toward the store, one entering while the other stayed outside. *Id*.

Chief Roseman testified that after encountering Clyde and Jerome, he received several radio calls about crimes involving a similar car. *Id*. at 1197. He drove around looking for the car and eventually found it on Highway 49. *Id*. Humphreys County Sheriff's Deputy Tim Goad arrived at the same time, passing Clyde and Jerome walking down the highway. *Id*. at 1198. By the time he turned around, Clyde and Jerome had run into a cotton field. *Id*.

Police searched the car. Inside, they recovered a shotgun and a set of keys fitting the liquor store lock. *Id*. They found a knife in a field nearby.[5] *Id*. The broken cash register was later recovered along the side of the highway. *Id*. at 1197. Clyde and Jerome were arrested the next morning. *Id*.at 1199.

The State argued that Jerome alone entered the store and shot the victim while Clyde remained outside. The eyewitnesses gave uncontradicted testimony that only one man went into the store. R/334, 337, 343, 346, 352. The police showed Kevin

---

[5] Bryant identified the knife as his own, testifying that he had loaned it to Clyde a week before. Pearce identified the knife as the one Clyde had brandished earlier that night.

Smith a photopack containing photographs of both Clyde and Jerome. R/343, 447. Kevin identified Jerome as the man he saw entering the store. *Id*. Kevin identified another man (not Clyde) as the man who remained outside. R/450. In court, Kevin identified both men. R/343, 447. The "third man" some witnesses claim to have seen at the scene was never identified. R/481-82. An expert for the State testified that a latent fingerprint and palm print were lifted from the gin bottle's brown paper bag holding a gin bottle that was recovered from the liquor store counter. *Id*. at 1195. Those prints matched Jerome's. *Id*. at 1195-96. The State stressed its witnesses testified "without equivocation" that "one of those individuals went into the store. Well—and it was the taller, slimmer one, and we know which one that was. It was Jerome." R/565-66.

Clyde and Jerome presented consistent alibi defenses. *Smith I*, at 1198. Clyde's girlfriend Cassandra Jefferson testified that Clyde was at her house in Belzoni all day until about 8:30 p.m., when he left with Jerome, Dot, and their mother. *Id*. Dot testified that a little after 8:00 p.m., she and her mother picked up Clyde at Jefferson's house. *Id*. She brought Clyde back to her mother's house, where Jerome was already asleep. *Id*. At approximately 8:45 p.m., Clyde and Jerome left in her car, a 1975 white-on-red Ford Elite. *Id*. Jefferson testified that Clyde and Jerome returned to her house at approximately 9:30 p.m. *Id*. Shortly thereafter, the two left in Dot's red and white car. *Id*. Yvonne Stewart, the owner of the Isola Lounge in Isola, Mississippi, testified that Clyde and Jerome arrived at the lounge sometime around

10:00 p.m. *Id*. She was certain of the time because when Clyde and Jerome arrived, she was on her way to buy ice at the grocery store next door, which closed at 10:00 p.m. *Id*. When she got there the doors were locked, but she could still see the owners inside counting money. *Id*.

The jury returned guilty verdicts on June 30, 1993. R/603.

**iii. Penalty phase**

The sentencing phase was conducted on July 1, 1993. R/627. The State alleged two statutory aggravating factors: that Clyde was previously convicted of a felony involving the use of violence; and that the capital offense was committed during the commission of an armed robbery. R/202; 264. In support of the first aggravator, the State presented evidence of Clyde's prior kidnaping conviction and two prior aggravated assault convictions, which arose from the same incident in which Jerome was his codefendant. R/633-36, 639-640, 674. The State argued that even though Clyde was not the shooter, he was not a minor participant and thus deserved the death penalty. R/676.

While Clyde and Jerome's guilt-phase defenses were consistent, their penalty phase presentations sharply diverged. Jerome's counsel attempted to capitalize on the State's argument, urging the jury to find Jerome less culpable because he was younger and had less criminal history than Clyde. R/679, 682.

Clyde's trial counsel presented only one witness: Clyde's mother, Leona Smith. R/641-50. Clyde and Jerome were the eighth and ninth of nine children. *Id*. They were 22 and 20 years old, respectively, at the time of the offense. *Id*. Leona testified

briefly that Clyde's father was "absent" due to frequent commitments to a state mental hospital at Whitfield, although she gave no clear description of the nature of his mental illness, saying only that he would "run off' and that he was "crazy." *Id*. She added that as a result, she chopped cotton and worked "for white peoples in they houses." *Id*. Dot, who was 14 years old when Clyde was born, took care of Clyde in her absence. *Id*. When the boys were small, if they did wrong, Leona or Dot would "strop" them. *Id*. Trial counsel's sole reference to this testimony in closing argument was that Leona "testified as to his upbringing, the difficulties that the family had, and the fact that in one year she lost three family members dear to her and that that was a tragedy." R/692.

The jury returned death sentences against both defendants. C.P. 225-26.

**B. Direct appeal**

Clyde and Jerome separately appealed.[6] Clyde's case was designated as Case No. 93-DP-1470-SCT.[7] On December 10, 1998, the Mississippi Supreme Court affirmed

---

[6] Jerome's case was designated as MSSC Case No. 93-DP-0821. The Mississippi Supreme Court reversed Jerome's death sentence and remanded his case for a new sentencing hearing. *Jerome "Pete" Smith v. State*, 724 So. 2d 280 (Miss. 1998). On March 5, 1999, Jerome Judge Evans re-sentenced Jerome to life without parole.

[7] On direct appeal, Clyde raised the following claims: 1. The jury failed to make an individualized finding of the degree of Clyde Smith's *personal* culpability for the homicide as required by Miss Code Ann. 599-19-101(7) and the Eighth and Fourteenth Amendments to the Constitution. 2. The evidence was insufficient to prove that Clyde Smith killed, attempted to kill, intended to kill, or contemplated the use of lethal force. 3. This Court should exercise its power under Miss. Code Ann. §99-19-105 to fix Clyde Smith's sentence at life imprisonment, given his minimal participation in the homicide of John Smith. 4. The trial court overreached its authority when it allowed the decision as to severance to be made by the defendant against the advise [sic.] of counsel. 5. The trial court's refusal to discharge the jury after it failed to reach a sentencing verdict after a reasonable time, and its failure to instruct the jury that it could return a verdict that it could not agree as to sentence, violated

Mississippi law and the Eighth Amendment to the United States Constitution. 6. The circuit judge erred in excusing venireperson Teretha Taylor on the basis of her intelligence level. 7. The trial court violated Mississippi law, the Eighth Amendment requirement of reliability in capital sentencing and the Fourteenth Amendment [right] of due process and right to confront witnesses by admitting evidence of crimes other than those for which Clyde Smith was on trial. 7(a) The trial court erred in overruling defendant' s objection to other crimes evidence presented by the witness Carolyn Pearce. 7(b) The trial court erred in permitting the introduction of the knife where it was not shown to have any relation to the offense. 7(c) The trial court erred in ruling that the defense could not impeach Carolyn Pearce without opening the door to the rape denied Clyde Smith his right to confrontation. 7(d) Testimony that a sawed-off shotgun was recovered from [] Smith's car was error. R/8. The trial court erred in allowing the State to call a witness previously undisclosed to the defense under the guise of "rebuttal" testimony. 9. The use of the "prior violent felony" aggravating circumstance in this case was error. R/10. The submission of evidence other than the actual conviction of Clyde Smith of kidnapping in support of the "prior violent felony" aggravating circumstance was error. R/11. The circuit judge erred in allowing the "felony-murder" aggravating circumstance to be submitted to the jury. 12. The trial court's instructions to the jury that they "may consider the detailed circumstances of the offense for the defendant was convicted" violated state law and the Eighth Amendment. R/13. The circuit judge erred, in violation of state law and the Eighth and Fourteenth Amendments, in excusing potential jurors after unrecorded bench conferences to which the defendant was not a party. 14. The trial court should have excluded as evidence items discovered by law enforcement officials in a warrantless search of appellants' car, which was not supported by probable cause. 15. The prosecutor violated the Eighth and Fourteenth Amendments and this Court's caselaw in his argument at the sentencing phase. 16. The circuit judge erroneously instructed the jury that death could be imposed if aggravating and mitigating circumstances were of equal weight. R/17. The guilt phase instructions in this case violated state law and deprived the defendant of fundamental fairness and due process of law. 17(a) Judge Evans's instruction on the robbery prong of capital murder failed to inform jurors of the necessary cause-and-effect connection between the "putting in fear" and the "taking" elements of this offense. 17(b) Judge Evans's charge on the elements of capital murder improperly amended the indictment by omitting the element of "malice aforethought." 17(c) The court's invitation to the jurors to find Clyde Smith guilty of capital murder on the basis of any single act "connected with" the charged offense erroneously relieved the state of its burden of proof. 18. The failure of the State to adequately preserve the chain of custody of several key exhibits violated state law and the Fourteenth Amendment. R/19. Identification of the defendant and of the red-and-white automobile violated state law and the federal Constitution. 20. The prosecutor's closing argument at the guilt phase included violations of state law and the Eighth and Fourteenth Amendments and require reversal. 21. The prosecutor's systematic use of peremptory challenges to exclude Black persons from the jury in this case demands a remand for a *Batson* hearing. 22. The death sentence should be reversed due to the accumulation of error that occurred at sentencing.

Clyde's conviction and death sentence. *Smith I.* Four justices voted to affirm, one justice did not participate, one justice concurred in the result only, and three justices dissented. *Id*. at 1226.

The dissenters focused on whether "... the trial court abused its discretion in allowing a death penalty defendant to override his attorneys' advice concerning trial strategy" in regard to being tried jointly with his brother. *Id*. The dissenters opined that this decision "demonstrably and adversely affected the defendant in the penalty phase," so that a new sentencing hearing was warranted. *Id*. at 1226-27. On Clyde's Motion for rehearing, four justices of the Mississippi Supreme Court voted to grant rehearing, four justices voted to deny, and one justice did not participate. Based on that split, the Motion for Rehearing was denied on February 25, 1999. *Id*. at 1194. The United States Supreme Court denied Clyde's petition for writ of certiorari. *Smith v. Mississippi*, 527 U.S. 1043, *reh'g denied*, 527 U.S. 1059 (Aug. 23, 1999).

**C. Initial state postconviction proceedings**

Clyde filed a skeletal *pro se* petition for postconviction relief and motion for the appointment of counsel in the Mississippi Supreme Court on August 23, 1999. Case No. 1999-DR-01394-SCR. On November 20, 2000, the Mississippi Supreme Court remanded the postconviction proceedings to the Leflore County Circuit Court for appointment of counsel. On January 18, 2001, the postconviction court appointed Alan M. Freedman, of Evanston, Illinois. On July 13, 2001, counsel filed a

supplemental motion for postconviction relief and requested an evidentiary hearing on the claims raised therein.[8]

On July 16, 2001, postconviction counsel filed a motion for funds to hire mental health experts. On August 17, 2002, the State responded to the motion. Clyde replied on November 4, 2002, again asking for an evidentiary hearing on his claims, and requesting a ruling on his pending motion for mental health expert funds. On June 19, 2003, counsel amended the motion to include claim XVIII, which alleged that Clyde's execution was precluded because he was intellectually disabled under *Atkins v. Virginia*, 536 U.S. 304 (2002).

On July 7, 2003, the postconviction court granted funds for a mental health expert; however, the amount of funds required the Mississippi Supreme Court to

[8] As the Mississippi Supreme Court summarized:

> Smith's attorney raises eighteen issues in the petition for postconviction relief and amendment thereto. The issues before this Court today involve, either directly or within the context of ineffective counsel, the following: (1) shackling during trial; (2) juror misconduct in both guilt and penalty phases; (3) failure to preserve *Batson* issues; (4) failure to fully present mitigation evidence at sentencing; (5) need to review death sentence in light of new evidence outside the record and co-defendant's life sentence; (6) exclusion of certain jurors; (7) no impeachment of material witness; (8) presence of sheriff in courtroom during trial proceedings; (9) allowing joint trial with co-defendant; (10) excusing of potential jurors after unrecorded bench conferences; (11) failure to object to jury instruction regarding aggravating and mitigating circumstances of equal weight; (12) prosecutor's improper closing argument in guilt phase and (13) in penalty phase; (14) erroneous instruction re: aggravating and mitigating circumstances; (15) jury failure to find degree of Smith's personal culpability; (16) jury instruction did not inform of all three sentencing options; (17) cumulative error, and (18) vacating Smith's death penalty due to mental retardation.

*Smith II*, at 377.

grant approval. On January 15, 2004, counsel moved the Mississippi Supreme Court to approve those funds. On May 20, 2004, the Mississippi Supreme Court, without ordering an evidentiary hearing, denied relief on all of Clyde's postconviction claims except his *Atkins* claim. *Smith II*, at 369. By separate order, the Mississippi Supreme Court denied the motion for funds to hire a mental health expert.

The case was remanded to the trial court for a hearing on Clyde's *Atkins* claim. *Id.* On October 27, 2016, an Agreed Order was entered by the Mississippi Supreme Court dismissing the *Atkins* claim with prejudice.

**D. Federal habeas petition**

This Court appointed CJA counsel David Calder and Marie Donnelly[9] to represent Clyde in federal habeas proceedings. Dkt. 2. Through counsel, Clyde timely petitioned for habeas relief.[10] Dkt. 3. A Response and a Reply/Memorandum of Law followed. Dkts. 22, 52.

Clyde also moved ex parte for authorization and funding for a psychologist and neuropsychologist in support of his ineffective-assistance-of-penalty-phase-counsel claim.[11] Dkts. 8, 13-15. This Court granted the motion in part, authorizing funds up

[9] In 2020, Ms. Donnelly took a position with Capital Habeas Unit of the Office of the Federal Public Defender for the Middle District of Florida. This Court granted the motion for substitution of counsel, retaining Ms. Donnelly as Clyde's counsel in her new capacity.
[10] This Court later allowed Clyde to correct his declaration, attached as Exhibit 2 to the original petition. Doc. 37.
[11] As noted above, Clyde's motion for mental health expert funds was denied by the Mississippi Supreme Court.

to $7,500 (based on the experts' hourly rates, Clyde had sought $40,150 in funding. Dkt. 39.

On December 13, 2018, Clyde moved to stay these proceedings while he asserted previously unexhausted claims in state court. Dkt. 53. This Court found, "for the reasons set forth in the instant motion and in accordance with *Rhines v. Weber*, 544 U.S. 269, 274 (2005), that good cause exists to stay these proceedings and hold them in abeyance." Dkt. 55. This case remained stayed while Clyde exhausted his claims in state court. *See, e.g.*, Dkts. 65, 81.

**E. Successive state collateral proceedings**

The Mississippi Supreme Court appointed Mr. Calder, Ms. Donnelly, and the Mississippi Office of Capital Postconviction Counsel to represent Clyde in state collateral proceedings. In accordance with Mississippi's Uniform Postconviction Collateral Relief Act (UPCCRA), Clyde applied to the Mississippi Supreme Court for leave to proceed in the trial court. Miss. Code Ann. § 99-39-27(1). On November 13, 2023, Clyde filed the application.[12] On February 4, 2025, the en banc Mississippi

---

[12] The application raised three claims: 1. Trial attorney Wallace Stuckey acted under the influence of an actual conflict that adversely affected his performance at trial, violating Clyde's right to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the U.S. Constitution and corresponding provisions of the Mississippi Constitution and state law. 2. Multiple defects invalidate two prior felony convictions of crimes involving violence upon which the trial court relied for aggravating circumstances in violation of the Eighth and Fourteenth Amendments to the United States Constitution under *Johnson v. Mississippi* and corresponding provisions of the Mississippi Constitution and state law. 2(A). The trial court sentenced Clyde to death based in part on his two aggravated assault convictions in Case No. 4698, which were then under appeal. The Mississippi Court of Appeals has since vacated one of those convictions. 2(B). The trial court relied upon an invalid conviction in Case No. 4216 to find the prior violent felony aggravator because that court lacked subject matter jurisdiction. 3. Trial counsel failed to investigate and present

Supreme Court denied the application, finding the claims were procedurally barred and without merit. *Smith v. State*, 410 So. 3d 1066, 1067 (Miss. 2025) ("*Smith IV*"). The United States Supreme Court denied Clyde's petition for writ of certiorari. *Smith v. Mississippi*, __ S.Ct. __, 2026 WL 79977 (Jan. 12, 2026).

**F. Present status of Petition**

Having now raised his claims in state court, Clyde moved this Court to lift the stay and for leave to amend his petition. Dkt. 83. This Court granted the motion. Dkt. 84. The amended claims are as follows.

## Claims

**I. Clyde's rights under the Eighth and Fourteenth Amendments were violated when the trial court permitted Clyde to veto his attorney's severance motion, which the court had already granted, and ordered Clyde be tried jointly with his codefendant. Trial counsel were ineffective for failing to protect Clyde's rights regarding the severance**

Clyde's rights to a fair and reliable sentencing hearing and due process of law were violated when the trial court permitted Clyde to veto his attorneys' severance motion, which the court had already granted, and ordering that Clyde be tried jointly with his codefendant, Jerome, even though a joint trial was severely prejudicial to Clyde's defense at both the guilt and penalty phases of the trial. Further, trial counsel were ineffective for failing to adequately protect Clyde's rights under the federal

mitigating evidence at the penalty phase in violation of Clyde's right to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Mississippi Constitution and state law.

constitution when they failed to ensure that Petitioner was adequately advised as to this matter and failed to object to trial court's ruling.

This issue was raised on direct review and, as a claim of ineffective assistance of counsel, on postconviction.

Attorneys for both defendants filed motions for severance asserting that defendants had developed inconsistent and antagonistic defenses, which would be prejudicial if tried jointly. C.P. 72, 75. On June 3, 1993, the trial court granted the Motions for Severance. R/21. However, at a subsequent hearing, the trial court, having been informed that Clyde and Jerome disagreed with their respective attorneys, conducted an inquiry into the defendants' desires as to severance. Both indicated that they wished to be tried together. The trial court rescinded the order granting severance. R/26-34.

In rescinding this order, the trial judge indicated that, on conviction, he would offer the option of separate sentencing hearings. *Id*. However, after the conviction of the defendants, the trial judge recanted this offer and ordered a joint sentencing trial. R/624-26. Trial counsel failed to object to the trial court's ruling. *Id.* At the outset of the penalty phase, trial counsel advised the court that it was, "against [counsel's] better judgment that we conduct a joint sentencing trial," but that Clyde desired a joint trial, and asked that Clyde acquiesce on the record. R/627-28.

At trial, Kevin Smith had identified Jerome, but not Clyde, in a photographic "lineup" shortly after the arrest. R/343, 447, 450. Clyde's picture was in the photo array, but Kevin had identified another individual, not Clyde. R/450. However, with

the presence of Jerome to guide him, Kevin identified both brothers at the trial itself. R/336. Furthermore, at the sentencing phase, Jerome's attorneys urged the jury to consider Clyde's role in both the aggravated assault case that was used in aggravation, and the robbery and murder itself, insisting that Jerome was "following his older brother." R/681-82. Thus, the jury was required to compare the culpability of the two brothers in determining their appropriate sentences. This is a classic case of inconsistent defenses where a lack of severance is prejudicial.

As Justice Banks observed in his dissenting opinion, "No defendant has a right to insist upon being tried with another, either through counsel or otherwise." *Smith I*, at 1227. To the contrary, the failure to grant a severance violates due process where, as here, the defendant would be prejudiced by a joint trial. The issue of whether to be tried jointly is one consigned to the control of counsel, not the client. The record does not reflect any adequate grounds for relinquishing that control. The trial court violated Clyde's rights to a fair and reliable sentencing, and due process of law, in vacating an order granting severance at the behest of the defendant against the advice of counsel. *See Blanco v. Singletary*, 943 F.2d 1477 (11th Cir. 1991).

In addition, trial counsel were ineffective under *Strickland v. Washington,* 466 U.S. 668 (1984), when they failed to adequately protect Clyde's right to a severance. It is clear from counsel's statements on the record that they believed it was against Clyde's interests to be tried jointly with Jerome. On direct review, trial counsel (who were also appellate counsel) argued that the trial court had committed reversible error in in rescinding the order of severance, insisting that Clyde had an absolute

right to a severance under state and federal law, and that severance is a tactical decision over which the defense attorney and not the defendant has the ultimate control. But trial counsel did not make these arguments in the trial court. Moreover, trial counsel's failure to object when the trial court stated the penalty phase would not be severed led the Mississippi Supreme Court to find the issue had been waived as to the sentencing. *Smith I*, at 1202. This was deficient performance.

Clyde was prejudiced because in order for each brother to escape the death penalty, he had to cast the other as the major player in the offense, and Clyde was forced to defend himself from not just the prosecutor, but the accusations of Jerome's counsel as well. As severance was initially ordered by the trial court, and is, in fact required at a capital trial under Mississippi Rule 4.04 of the Uniform Rules of Circuit Court Practice, there is a reasonable probability that the trial court would have allowed the severance had trial counsel not acquiesced to Clyde's uniformed request for a joint trial. There is a reasonable probability that Clyde would not have been sentenced to death had he not been placed in this untenable position at the penalty phase of his capital trial.

## II. Clyde's trial counsel were ineffective for failing to make a timely objection under *Batson v. Kentucky* where the State used the majority of its peremptory strikes to remove African Americans from the jury and a prima facie case of racial discrimination in jury selection existed

Trial counsel's failure to object to the State's use of peremptory challenges to eliminate African Americans from the jury panel constituted ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984).

This claim was raised in state postconviction proceedings. The jury composition evidence to support this claim was recreated in hindsight by Jerome's appellate counsel. A supplemental hearing on these issues was conducted on May 20, 1994, but Clyde's attorneys did not appear or participate in that hearing. Supp. R., at 4-31.

In *Batson v. Kentucky,* 476 U.S. 79 (1986), the Supreme Court held that the Equal Protection Clause forbids the prosecutor from peremptorily challenging potential jurors solely on account of race. *Id.* at 96. Under *Batson,* if a defendant can show that the prosecutor has struck even one venire person on the basis of race, he is entitled to a new trial. *E.g., United States v. Ferguson*, 935 F.2d 862 (7th Cir. 1991). A *Batson* hearing normally progresses through three stages: (1) the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race; (2) once that showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question; (3) the trial court, after hearing the defendant's response, must decide whether those reasons are pretextual and whether the defendant has thus proven purposeful discrimination. *Batson*, 476 U.S. at 96-98.

A prima facie case of discrimination can be made out by offering a wide variety of evidence, so long as the sum of the proffered facts gives "rise to an inference of discriminatory purpose." *Id*. at 94. The Court explained:

> [A] defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. To establish such a case, the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has

> exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.

*Id.*, at 96 (internal quotations and citations omitted).

In this case, although Black people comprised a majority of the adult population of Leflore County and of the jury pool in this case, the 14 individuals chosen for jury service – 12 jurors and two alternates – included only three African Americans (all of whom were female). Assistant District Attorney Crook used 11 of his 13 peremptory strikes to remove African Americans from the jury.

Not a single one of the 11 African American citizens eliminated by the prosecution made any statement during voir dire, let alone gave any indication of potential bias against the State. Although the trial court permitted individual questioning of the jurors, R/142-61, the prosecutor never attempted to question any of these individuals.

The stricken Black individuals were heterogeneous in virtually every respect: some were single, while others were married; some had children, while others did not; some were college educated, others had not graduated high school; some had previous jury service, others had none; they lived in various parts of the county; and had different jobs ranging from nurse, to factory worker, to salesperson, to no

employment at all. (Supp. C.P. at 11-37). The only common characteristic was they were all Black.

Moreover, several of the excluded Black venirepersons had characteristics similar to white individuals who served on the jury. For example:

| SELECTED | EXCLUDED | RACE | OCCUPATION | EDUCATION |
|---|---|---|---|---|
| 1. Ramona Bills | | W | Nurse | College |
| | Louis King | B | Licensed Practical Nurse | College |
| 2. Jimmy Henson | | W | Laborer | Jr. High |
| | Annie Fletcher | B | Factory Worker | High School |
| | I.V. Martin | B | Factory Worker | High School |
| | Ivory Tims | B | Factory Worker | High School |
| 3. George Byrd | | W | Auto-Farm Equip. Stock | High School |
| | Michael Harris | B | Over Supplies | High School |
| | Eddie Matthews | B | Range Packer | College |
| | Jacqueline Spells | B | Rockey Mgmt. | High School |

Supp. C.P. 11-37.

Counsel's passivity in light of an obvious pattern of strikes against Black prospective jurors fell below an objective standard of reasonableness and amounted to deficient performance under *Strickland*. Counsel had no strategic basis for failing to protect his client's rights under *Batson*. By the time of Petitioner's trial, state courts in Mississippi had found prima facie cases of racially discriminatory exercises of peremptory challenges in other criminal prosecutions with similar or less troubling

numbers than those at Petitioner's trial. *See, e.g., Chisolm v. State*, 529 So. 2d 630, 637 (Miss. 1988) (prima facie showing established where prosecution used seven of 12 peremptories to remove Black individuals, leaving only three Black individuals to serve on the jury*); Chisolm v. State*, 529 So. 2d 635, 632 (Miss. 1988) ("no doubt" of prima facie showing where prosecutor used nine of ten peremptories to remove Black individuals, leaving only four Black jurors to serve on jury); *Conerly v. State*, 544 So. 2d 1370, 1372 (Miss. 1989) (prima facie showing where prosecutor used five peremptories to remove Black individuals and only one Black person served on the jury).

Moreover, trial counsel, who also represented Clyde on direct review, raised this issue, alleging the same facts, on direct review. The state court deemed the issue "waived" because counsel had "made no objection in the trial court to any of the State's peremptory strikes, he never asked that the State articulate race-neutral reasons for those strikes, nor did he object to the final composition. *Smith I*, at 1201.

To prevail on a claim of the ineffective assistance of counsel, a petitioner must establish both that counsel performance was deficient and that he was prejudiced as a result of counsel's deficient performance. *Strickland v. Washington,* 466 U.S. 668, 687 (1984). *Batson* violations fall within a limited and unique category of claims – structural errors – which, by the nature of their impact upon the fundamental fairness of a trial, are not subject to conventional harmless error or prejudice analysis. *See Vasquez v. Hillery,* 474 U.S. 254, 263 (1986) (intentional discrimination in the selection of grand jurors undermines the structural integrity of the criminal tribunal

itself, and is not amenable to harmless-error review); *Powers v. Ohio*, 499 U.S. 400, 416 (1991) (reversing and remanding based upon a finding that the defendant was wrongfully barred from raising a *Batson* claim); *see also Tankleff v. Senkowski*, 135 F.3d 235, 248 (2d Cir.1998) (noting that a *Batson* violation is a structural defect). When counsel's deficient performance causes a structural error, *Strickland* prejudice is presumed. *Bell v. Jarvis,* 236 F.3d 149, 165 (4th Cir. 2000) (*en banc*); *id.* at 180 (same in dissent); *McGurk v. Stenberg,* 163 F.3d 470, 475 (8th Cir. 1998). Accordingly, prejudice should be presumed in this case, and Clyde's convictions and death sentence should be vacated.

In addition, or in the alternative, Clyde was prejudiced by counsel's failure to protect his rights under *Batson*, because counsel's errors rendered the trial fundamentally unfair. *See Strickland*, at 696 (when a court is evaluating prejudice, the ultimate inquiry must concentrate on "the fundamental fairness of the proceeding"). As the Supreme Court has repeatedly recognized, race-based discrimination in jury selection, harms criminal defendants, as it is likely the prejudice that motivated the discriminatory selection of the jury will infect the entire proceedings. *See, e.g., Edmonson v. Leesville Concrete Co*., 500 U.S. 614, 628 (1991) (discrimination in the courtroom "raises serious questions as to the fairness of the proceedings conducted there"). There is ample empirical data to support the Court's reasoning. Bowers, Steiner, & Sandys, *Death Sentencing in Black and White: An Empirical Analysis of the Role of Jurors' Race and Jury Racial Composition*, 3 U. Pa J. Const. L. 171 (2001)

(summarizing juror studies regarding the differences in the way African-American jurors perceive the evidence and the way African-American defendants are treated as the proportion of African-Americans on juries increases). *See also*, David Baldus, et al., *Racial Discrimination and the Death Penalty in the Post-Furman Era: An Empirical and Legal Overview*, 83 Cornell L. Rev. 1638, 1724-25 (1998).

Finally, even if Petitioner must show that there is reasonable probability that the outcome would have been different, he can make such a showing in this case. The evidence in this case was entirely circumstantial as to the two defendants, and particularly weak with respect to Clyde's role in the crime. For example, the only witness to identify Clyde as being present outside of the store, the victim's son Kevin failed to identify Clyde when his picture was presented in a photo array and only made this "identification" in-court, when Clyde was at the defense table.

Moreover, there is clear evidence that prosecutor's unchecked exclusion of African-American males, in particular, prejudiced Clyde at the penalty phase. In state postconviction proceedings, Clyde presented the affidavit of Marla Sandys, co-author of *Death Sentencing in Black and White*, who described a study that found that the addition of one African-American male juror in a capital case made a stark statistical difference: in the absence of Black male jurors, death sentences were imposed in 66.7% of the cases, as compared to 42.9% when one Black male was on the jury. PC Ex. 6, Sandys Aff. at 3; *see also* Bowers, Death Sentencing, at 193. Sandys concluded based on this research, "there is a reasonable probability that the

presence of a single Black male on the jury makes a sentence of life more likely than not." *Id.*

## III. Clyde's trial counsel were ineffective for failing to object when, without justification, Clyde was forced to appear before the jury wearing shackles for the duration of his capital trial

Throughout the guilt and penalty phases of his capital trial, Clyde was forced to wear leg shackles. The trial record makes no reference to the shackles or to the need for restraint. There is no evidence that Clyde was obstreperous or disruptive. In short, the record shows nothing to support an individualized determination that Clyde required any form of restraint at trial, and there is no explanation in the trial record for use of the shackles or any other restraint. The shackles were not mentioned by the parties or the court in Clyde's direct appeal. Trial counsel were ineffective for failing to object to the use of the shackles. *Strickland v. Washington*, 466 U.S. 668 (1984).

This claim was raised in state postconviction proceedings.

States are precluded from engaging in the inherently prejudicial practice of shackling a criminal defendant before the jury except as a last resort, when justified by a state interest specific to the particular defendant on trial. *Holbrook v. Flynn*, 475 U.S. 560 (1986); *Estelle v. Williams*, 425 U.S. 501 (1976); *Illinois v. Allen*, 397 U.S. 337 (1970). In *Deck v. Missouri,* 544 U.S. 622, 635 (2007), the Court reaffirmed the well-established constitutional restrictions on restraining criminal defendants and held that shackling may even prejudice a defendant who was shackled only during the penalty phase of a capital trial.

During state postconviction proceedings, Clyde offered evidence indicating that two jurors observed Clyde wearing shackles during the course of his trial. Clyde provided an affidavit from juror Joseph Cascio, which stated, "I observed Clyde Wendell Smith wearing leg shackles during the course of the legal proceedings in the courtroom." PC Ex. 3, ¶2. He also attached the affidavit of Christina Spivey, a social work intern employed by postconviction counsel, who stated that she witnessed juror Mary Ann Stanton state the following: "That she, Mary Ann Stanton, remembers the defendants having their legs and arms shackled during the trial." PC Ex. 1, ¶8. Ms. Stanton, who also stated in Ms. Spivey's presence that she was a local elections commissioner and a personal friend of the trial judge in this case, PC Ex. 1, ¶¶ 2, 4, refused to provide an affidavit to postconviction counsel. PCR Reply Br., filed Nov. 4, 2002, at 4, n.1. Postconviction counsel requested an evidentiary hearing on this issue and advised the state court that wished to subpoena Ms. Stanton to obtain her testimony regarding this matter. *Id*.

Because at the time of Clyde's trial it was well-settled that the requirements of federal due process that no form of visible restraint was permissible without an individualized finding that the defendant presented a risk of escape, violence, or disruption of the trial, *see, e.g., Allen*, 397 U.S. at 337, counsel had no justification for failing to object to restraints in this case. Accordingly, counsel's conduct fell below the prevailing professional norms and met the first prong of *Strickland*. The record also establishes a reasonable probability that his counsel's failure to object to Clyde's shackles affected the result in the guilt and penalty phases of his trial. An objection, if

made, would have been successful in the trial court, or would have produced the basis for a successful appeal. A defendant in shackles, if perceived by the jury: (1) sends a signal that the defendant may be dangerous and thereby impairs the presumption of innocence; (2) interferes with the defendant's communication with his attorney; and (3) it offends the dignity of the trial process. Even had the jury been unaware of the restraints, shackles also interfere with a defendant's ability to confer with counsel and participate in his own defense.

The evidence against Clyde was far from overwhelming. There is a reasonable probability he would not have been convicted had he not been subjected to this inherently prejudicial practice. Moreover, in a capital case, the appearance of the defendant in restraints may be prejudicial as to the sentencing decision, even when it was not so at the guilt phase. *See, e.g., Roche v. Davis*, 291 F.3d 473, 483-484 (7th Cir. 2002). The Supreme Court has explained that even when appearance of a defendant in restraints does not undermine the jury's effort to apply the presumption of innocence, "shackles at the penalty phase threaten related concerns." *Deck v. Missouri,* 544 U.S. at 632 (citations omitted).

In *Deck*, the Supreme Court unequivocally held that, based on "common sense," shackles send a clear message about a defendant's character: someone, presumably someone in a position to know, has determined this defendant is especially dangerous. *Id.* at 632. Indeed, "[t]he sight of a shackled litigant is apt to make jurors think they're dealing with a mad dog. . .." *Maus v. Baker* 747 F.3d 926, 927 (7th Cir. 2014).

The appearance of Clyde in shackles thus improperly influenced the jury's appraisal of whether Clyde will be a danger in the future, a factor that, as the Supreme Court recognized, "is nearly always a relevant factor in jury decision-making, even where the State does not specifically argue the point." *Id.*[13] The shackles specifically undermined one of the mitigation theories the defense offered in this case: that Clyde would not be dangerous because Clyde will spend the rest of his life in prison. R/687.

The shackles were also likely to affect adversely the jury's perception of Clyde's character, which is likewise a critical part of the sentencing decision. *Deck,* 544 U.S. at 633. The appearance of Clyde in a shackles was also prejudicial because restraints may adversely affect the jury's appraisal of a defendant's character not only through what jurors are likely to infer from actually seeing the defendant's restraints, but also from effects wearing a shackles has on defendant's demeanor while in court. For these reasons, there is a reasonable probability that Clyde would not have been sentenced to death but for counsel's failure to prevent his appearance before the jury in shackles.

---

[13] Social science studies have confirmed that the defendant's future dangerousness is a crucial aspect of capital sentencing deliberations. *See, e.g.,* John H. Blume, *et.al, Study: Future Dangerousness in Capital Cases: Always "At Issue,"* 86 Cornell L. Rev. 397, 410 (2001) (empirical data shows that "future dangerousness is on the minds of most capital jurors and thus "at issue" in virtually all capital trials, even if the prosecution says nothing about it").

## IV. Clyde was denied his right to fair and impartial jury because jurors were exposed to extraneous, prejudicial influences

During postconviction proceedings, Clyde presented evidence that the jurors believed and discussed that Clyde had committed a rape, when no such evidence was presented at trial, and that the jurors further believed that Clyde would be eligible for release from prison notwithstanding the fact that he had already been sentenced to life without parole. Nobody advised the trial court or the parties that such extraneous information was being discussed amongst the jurors. Each of these instances of juror misconduct, individually and cumulatively, deprived Clyde of his right to a fair and impartial jury and a fair trial as guaranteed by the Sixth and Fourteenth Amendments.

Clyde raised this claim in state postconviction proceedings. In each instance the state court denied Clyde's claim, without an evidentiary hearing, and simply assumed that Clyde was not prejudiced by the jurors' conduct. *Smith II,* at 379-80.

The Sixth Amendment affords an accused the right to trial by an impartial jury. *See Duncan v. Louisiana,* 391 U.S. 145, 160 (1968); *Turner v. Louisiana,* 379 U.S. 466 (1965). As the Supreme Court has observed, a "touchstone of a fair trial is an impartial trier of fact – 'a jury capable and willing to decide the case solely on the evidence before it.'" *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 554 (1984) (*quoting Smith v. Phillips*, 455 U.S. 209, 217 (1982)). In addition, the clause requires the trial judge, if he becomes aware of a possible source of bias, to

"determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial." *Remmer v. United States*, 347 U.S. 227, 230 (1954).

**A. The jurors' discussion of the rumor that Clyde and Jerome raped a woman**

During postconviction proceedings, Clyde submitted the affidavit of Christina Spivey, a social work intern employed by postconviction counsel, who stated that she witnessed juror Mary Ann Stanton state the following to postconviction counsel:

> That she, Mary Ann Stanton, believed at the time of her deliberations as a juror in the trial and sentencing of Clyde Wendell Smith and his brother and co-defendant, Jerome Pete Smith, that they had raped a woman, and she considered this fact in her decision.

PC Ex. 1, ¶3. Ms. Stanton, who also stated in Ms. Spivey's presence that she was a local elections commissioner and a personal friend of the trial judge in this case, PC Ex. 1, ¶¶ 2, 4, refused to provide an affidavit to postconviction counsel. November 4, 1992, Postconviction Reply Brief, at 4, n.1. Postconviction counsel requested an evidentiary hearing on this issue and advised the state court that wished to subpoena Ms. Stanton to obtain her testimony regarding this matter .*Id*.

Clyde also provided an affidavit from juror Carolyn Mack, which stated that the jurors had discussed that that Jerome had also committed rape in the past. PC Ex. 2, ¶5. The jurors never disclosed this information to the trial court. Postconviction counsel requested a hearing on this matter in the state court, in his postconviction motion and his reply. The state court did not order an evidentiary hearing on this matter or even discuss the petitioner's request for such a hearing. *Smith II*, at 379-80. The court refused to consider Spivey's sworn affidavit as to Juror Stanton's

statements made to postconviction counsel in her presence, deciding that this affidavit was not "proper" because it was not from the juror herself and thus "hearsay." *Id.* at 380. The state court also faulted Clyde for failing to provide evidence *from a juror* indicating how this information affected the verdict, while simultaneously asserting that Mississippi law prohibits juror testimony on this topic. *Id.* The state court disposed of this claim as follows:

> Smith has failed to show any prejudicial jury misconduct here. The only valid affidavit states merely that some jurors had heard that Jerome Pete Smith, not Clyde Wendell Smith, had committed a rape in the past. There is no allegation that the jurors came to their decision based on a rape allegation against Jerome Smith.

*Id*. There was no evidence presented at trial regarding any alleged rape by Clyde or Jerome. For the jurors to discuss whatever they had learned or heard regarding such allegations during the course of the trial was absolutely improper and in direct contravention of the trial court's directives. Bringing any extra-judicial information about the case into the jury room is improper, but the misconduct was especially egregious in this case. These jurors were discussing a topic that is considered particularly prejudicial: the defendant's alleged prior bad acts. In a criminal trial, such information, even when reliable, is so prejudicial that is inadmissible except under very limited and controlled circumstances. Any transgression of this rule, even indirectly, is likely to lead to reversal. Here, these jurors considered such evidence outside the courtroom, where Clyde had no opportunity to deny or explain the information, with no directives from the court as to its use.

Such a situation is inherently prejudicial and requires reversal of Clyde's convictions and death sentence. In the alternative, further inquiry is required pursuant to *Remmer* and its progeny. *Remmer*, 347 U.S. at 229 (when juror receives extraneous information of character that could reasonably contaminate jury deliberations, prejudice is presumed unless rebutted by the State); *see also Wisehart v. Davis,* 408 F.3d 321, 326-27 (7th Cir. 2005) (granting writ and vacating judgment because juror affidavit indicated that juror was aware of extraneous potentially prejudicial information, and state postconviction court failed to conduct further inquiry).

**B. The jury's consideration of whether defendant would be paroled notwithstanding a life without parole sentence**

Under Mississippi law, it was well established at the time of Clyde's trial that, except in habitual offender cases (where a life sentence would automatically mean life without parole), the parole issue should not be considered by the sentencing jury. *See, e.g., Mackbee v. State,* 575 So. 2d 16, 40-41 (Miss. 1990). In Mississippi's original case on this issue, *Williams v. State*, the court held that a "jury should have no concern with the quantum of punishment because it subverts a proper determination of the sentencing issue." 445 So. 2d 798, 812-14 (Miss. 1984).

Prior to trial, Clyde had in fact been sentenced to life without the possibility of parole as a habitual offender, and jury was so instructed. However, after approximately three hours of penalty phase deliberations, the jury sent out a note, which read:

> The jury is aware that Clyde Smith has been sentenced in the past with life without parole. Our question is, if we sentence Jerome Smith to a life sentence, will he be eligible for parole?

C.P. 283. Over Jerome's objections, the trial judge returned the note to the jury with a written answer, which read, "Jerome Smith will be eligible to be considered for parole. /s/ Gray Evans, Circuit Judge." *Id*. The jury subsequently returned a verdict sentencing both Jerome and Clyde to death.

On direct review, the Mississippi Supreme Court reversed Jerome's death sentence, finding that the trial court committed reversible error by informing the jury that if given a life sentence he would be eligible to be considered for parole. *Jerome Smith v. State*, 724 So. 2d 280, 293 (Miss. 1998).

During Clyde's state postconviction proceedings, jurors told postconviction counsel that they had also believed that *Clyde* would be eligible to be paroled or released, notwithstanding his life without parole sentence, and that the jury had discussed this information, which had influenced its decision to sentence Clyde to death. Juror Joseph Cascio swore in his affidavit:

> I believed at the sentencing hearing that both Clyde Wendell Smith and Jerome Pete Smith would have been released on parole had they not gotten the death sentence. The possibility of parole was a contributing factor to the final sentencing verdict. I believe there were other jurors who believed at the sentencing hearing that both Clyde Wendell Smith and Jerome Pete Smith would have been released on parole had they not gotten the death sentence.

PC Ex. 3. Juror Mary Ruth Cage swore in her affidavit:

> I wanted to vote for life, but the majority of the jurors said that if we gave them life there was a possibility they would do ten years and then get out.

PC Ex. 4. Juror Carolyn Mack swore in her affidavit:

> At the time of the sentencing deliberations, I believed that if Clyde Wendell Smith did not get the death penalty he would have gotten out.

PC Ex. 2. And Mary Ann Stanton, stated that "there were jurors with small children who expressed that they were worried and concerned that both brothers could be paroled if they did not sentence them to death." PC Ex.1.

It is evident from the sworn affidavits of three jurors, and the statements made by fourth, that one or more of the jurors had an inaccurate view of the law and the facts and repeated that misinformation to the other jurors. Moreover, the trial court's improper response to the jury's inquiry concerning Jerome's parole eligibility was likely to have either prompted this improper discussion or to have made matters worse. Postconviction counsel repeatedly requested a hearing on this matter in the state court. The state court did not order an evidentiary hearing, but instead assumed, without further inquiry, that the jurors must have been lying. *Smith II*, at 382.

It is clear that this inaccurate information indicating Clyde would be eligible for parole significantly influenced the jury's decision to sentence Clyde to death. Accordingly, his death sentence should be vacated.

**V. Trial counsel provided ineffective assistance of counsel for not making a contemporaneous objection that the trial judge erred in violation of the Due Process Clause of the Fourteenth Amendment by excusing potential jurors after unrecorded bench conferences to which the Defendant and his attorneys were not privy**

Prior to trial, Clyde filed a Motion to Require the Court Reporter to Transcribe the Entire Proceedings. C.P. 90. This request was granted. R/34. In fact, the trial court noted that he would have insured that such was done even had the motion not been filed. R/34. However, as it turned out, several times throughout the voir dire, the trial court conferred with potential jurors at the bench without the presence of either defense counsel, the defendant, or the court reporter. R/51, 64, 70. More than a few potential jurors were excused by the Court without the participation of defense counsel or the defendant. The failure to have the defendant present at these bench Conferences, and the failure to have them transcribed, violated Clyde's rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

The United States Supreme Court has emphasized the "importance of reviewing capital sentences on a complete record." *Dobbs v. Zant*, 506 U.S. 357 (1993). Trial counsel was ineffective for not preserving this error by failing to make a contemporaneous objection to this structural error. *Allen*, 397 U.S. at 338; *Snyder v. Massachusetts*, 291 U.S. 97 (1934).

This claim was raised in state postconviction proceedings.

**VI. Clyde was denied the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments at the guilt phase of his trial**

Clyde was denied the effective assistance of counsel at the guilt phase of his trial. *Strickland v. Washington*, 466 U.S. 688 (1984). Counsel failed to conduct a meaningful investigation into the facts of the case and failed to object to instances of

prosecutorial misconduct. These deficiencies prejudiced Clyde. These claims were raised in state postconviction proceedings.

**A. Failure to impeach Sheriff Ricky Banks**

Sheriff Banks undermined Petitioner's alibi defense by testifying that a person could drive from Sidon to Isola in 30 to 40 minutes. R/468-471. The statement of Tommy Peoples, the person who found Johnny B. Smith's cash register, reveals that the cash register was found three miles south of Sidon. Ex. F. Had counsel conducted reasonable investigation, they would have found that a drive from Sidon to Isola, using the route where the cash register was found, would take more than one hour. Because there are two ways to drive from Sidon to Isola, Sheriff Banks was able to present misleading testimony that undermined Clyde's alibi defense.

**B. Failure to cross-examine Eddwantya Epps with her prior statement**

A defendant in a criminal trial has a due process right, guaranteed in the Confrontation Clause of the Sixth Amendment to the Constitution, to impeach witnesses by cross-examination so that they may have an opportunity to discredit witnesses before the Jury. *Delaware v. Van Arsdall*. 475 U.S. 673, 680 (1986); *Davis v. Alaska*, 415 U.S. 308, 315 (1974); *Douglas v. Alabama*, 380 U.S. 415, 418 (1965). Trial counsel was ineffective for not impeaching a key witness with inconsistent statements and other documentary evidence.

Eddwantya Epps testified at the guilt phase that she had seen two Black men at John Smith's package liquor store on the night he was murdered. One outside the store, she described as "light-skinned." R/346. She saw the other man come out of

the store; she could not describe him, but he seemed taller than the man she saw outside. R/347. Clyde's trial counsel did not cross-examine this witness at all. The witness could have been confronted with her November 11, 1992, statement to the Sheriff's Department, in which she stated that both men were "light skinned" Black men. PC Ex. 18. Counsel should have made this point, as both Clyde and Jerome had dark skin. A minimally effective cross-examination would have impeached Epps.

**C. Failure to object to prosecutorial misconduct**

A prosecutor who in closing arguments to the jury "so infected the trial with unfairness as to make the resulting conviction denial of due process" violates a defendant's rights guaranteed by the 14th Amendment to the United States Constitution. *Donnelly v. DeChristoforo*, 466 U.S. 637, 642 (1974 ). This standard is applicable to death sentencing proceedings. *Darden v. Wainwright,* 477 U.S. 168 (1986).

In this case, there were numerous instances of improper prejudicial arguments by the State. After the defense lawyers for both defendants pointed to weaknesses in the State's case, the prosecutor asserted, in his rebuttal closing argument, that the State's proof was sufficient because many other criminals, including Ted Bundy, had been convicted on the basis of similar circumstantial evidence:

> Don't convict on circumstantial evidence? Ladies and gentlemen, there are convictions every day in this country. There is not one bit of difference - - you didn't hear Judge Evans tell you, "Oh, wait a minute now. Circumstantial evidence, that ain't quite as good as - - " he can't tell you that because that's not the law. In fact, Ted Bundy was convicted on

> circumstantial evidence. Some of you may know who he was. But the circumstantial evidence that they had on Ted Bundy was a bite mark and that's all. Nobody saw him do it. Same thing with fingerprint. Fingerprint's circumstantial. The Crime Lab man didn't see him put his finger there. Same thing. No.

R/598-99.

Clyde's alibi defense was that he could not have committed the murder in Sidon at 9:15 p.m. or 9:30 p.m. because he was seen at a nightclub miles away in Isola at 10:00 p.m. In an effort to rebut that defense, the Prosecutor argued based on facts not in evidence that Clyde and Jerome could have traveled "from Sidon to Isola" in 30 or 45 minutes because the Prosecutor's own personal experience of commuting to work showed that a similar trip could be made within this time. R/600-01.

Both sets of highly prejudicial comments by the Prosecutor referred to matters that clearly were not in evidence, and the comments were highly prejudicial to the defense. Trial counsel was ineffective for not making a contemporaneous objection in order to preserve these prejudicial errors. This was a close case of capital murder based primarily on circumstantial evidence. The improper comments by the Prosecutor unduly prejudiced Clyde.

## VII. Clyde was denied due process of law when the trial court allowed the State to call Jerry Smith because the prosecutor had failed to provide pretrial notice of this witness

Toward the end of the prosecution's case-in-chief at the guilt phase, the prosecutor attempted to call Jerry Smith, a Leflore County deputy and the victim's brother, as a witness. Assistant District Attorney Crook sough to have Jerry Smith provide important testimony that he observed a red and white car near the scene of

the crime shortly before the victim was shot, and had noticed a spot from a transmission leak on the ground beneath the car, the same kind of leak he discovered when he examined the brothers' car after it was seized from the side of Highway 49. R/353-56.

Clyde and Jerome both objected, noting that they had not been alerted previously that Jerry Smith might be a witness, or as to the nature of the testimony. R/357. The trial court agreed that neither Clyde nor Jerome had been furnished the name of this witness or informed about the substance of his testimony. The trial court also found the failure marked a breach of the prosecution's discovery obligations under Miss. Rule 4.06(a)(1) of the Uniform Criminal Rules of Circuit Court Practice, which requires pretrial disclosure of the names and addresses of witness the prosecution intends to call at trial to the defense. Accordingly, the trial court prohibited the prosecution from presenting Jerry Smith. R/358.

Yet, after Clyde called witnesses at the guilt-phase to establish an alibi, offering testimony that he was with his girlfriend and mother around the time of the shooting, the prosecutor renewed his request to call Jerry Smith to provide the testimony described above, this time arguing that the same evidence was rebuttal. R/546-47. The trial judge rescinded his previous order, and Jerry Smith testified as the prosecutor indicated he would. R/549-54.

This was improper. Jerry Smith's testimony could not reasonably be characterized as proper rebuttal evidence, as it was not directed at the alibi testimony, but was simply another link in the State's circumstantial evidence

concerning the identity between the brothers' car and the automobile supposedly used by the perpetrators of the offense.

Allowing Jerry Smith to testify—when the prosecution failed to properly notify the defense of the witness prior to trial as required by state law—deprived the defense of "a fair opportunity to challenge the accuracy or materiality of the evidence." *Gardner v. Florida*, 430 U.S. 349, 357 (1977). Admission of this testimony violated Clyde's rights under the Eighth and Fourteenth Amendments. *See Smith v. Estelle*, 602 F.2d 694, 699 (5th Cir. 1979), *aff'd sub nom. Estelle v. Smith*, 451 U.S. 454 (1981).

This claim was raised on direct review.

## VIII. Clyde's death sentence violates the Eighth and Fourteenth Amendment because the jury failed to make an individualized determination that he possessed the requisite personal culpability to eligible for a death sentence

In this case, Clyde was deprived of his rights under the Eighth Amendment, and due process clause of the Fourteenth Amendment, because the jury failed to make an individualized determination that he possessed the requisite personal culpability to eligible for a death sentence. This claim was presented on direct review, based on the verdict form returned by the jury, and in state postconviction proceedings, based on affidavits submitted by jurors.

### A. The verdict forms returned by the jury indicate the jury failed to find the defendant possessed the requisite personal culpability to eligible for a death sentence

Mississippi's capital sentencing statute forbids a jury from imposing a death sentence unless it unanimously makes a written finding that "the defendant actually

killed," "the defendant attempted to kill," "the defendant intended that the killing take place," or "the defendant had contemplated that lethal force would be employed." Miss. Code Ann. §99-19-101(3)(a) and 99-19- 101(7). *See also Pinkton v. State*, 481 So. 2d 306 (Miss. 1985). Such a finding is also required by the Eighth Amendment. *Tison v. Arizona,* 481 U.S. 137, 158 (1987); *Enmund v. Florida*, 458 U.S. 782, 797 (1982). In fact, the Eighth Amendment requires a greater degree of culpability than the Mississippi statute, as in *Tison*, the Court made clear that a non-triggerperson only may be subject to the death penalty if he is "a major participa[nt] in felony committed" and displays "reckless indifference to human life." *Id.* at 158.

In this case, however, the jurors never specifically found that the evidence proved beyond a reasonable doubt Clyde had actually killed the victim, had intended that the killing take place, or had contemplated that lethal force would be employed. Rather, the jury's verdict found in the affirmative on all three questions as to the "*defendants*," but rendered no finding addressing their finding (if any) as to Clyde's conduct individually. The jury's verdict stated:

> We, the Jury, as to Clyde Wendell Smith, unanimously find from the evidence beyond a reasonable doubt that the following facts existed at the time of the commission of the capital murder:
> 1). That *the defendants* actually killed Johnny Smith
> 2). That *the defendants* intended the killing of Johnny Smith take place
> 3). That *the defendants* contemplated that lethal force would be employed.

C.P. 202 (*emphasis supplied*).

The use of the plural "defendants," instead of "defendant," indicates that the jury considered the two defendants together and did not specifically decide whether

Clyde actually killed the victim, intended the killing, or contemplated the use of deadly force.

Moreover, the jury instructions were ambiguous on this point. Although jurors were told to return a separate verdict form for each defendant, C.P. 269, Instruction S-1 told the jury:

> To return the death penalty in this case you must first unanimously find from the evidence
> beyond a reasonable doubt that one or more of the following facts existed:
> 1). That the defendants actually killed Johnny Smith
> 2). That the defendants intended the killing of Johnny Smith take place
> 3). That the defendants contemplated that lethal force would be employed

C.P. 265-66. Instruction C-CR-2 told the jury they must consider the punishment and the aggravating and mitigating circumstances to each defendant separately but made no reference to the findings the jury was required to make regarding the *Enmund* factors under Miss. Code Ann. §99-19 101(3)(a) and 99-19-101(7). C.P. 278.

The evidence presented at trial and the prosecutor's argument, further support this interpretation. The State's evidence showed that two or three men were at the scene of the victim's death at the Sidon Package Liquor Store. R/233, 253, 308-09, 325, 480-81. The only witnesses to the events outside the store gave uncontradicted testimony that only one individual went into the store. R/334, 337, 343, 346, 352. Kevin Smith identified Jerome as the man who went into the store. R/447, 450. Additionally, it was Jerome who left a fingerprint inside the store. R/459. The prosecutor specifically argued that these witnesses

testified "without equivocation" that, "one of those individuals went into the store. Well – and it was the taller, slimmer one, and we know which one that was. It was Jerome." R/565-66.

In light of this evidence, and the State's theory, the jury's finding that, "defendants," which would necessarily include Clyde, actually killed Johnny Smith clearly indicates that the jury did not make the requisite finding as to Clyde's personal culpability required by the Eighth Amendment.

Moreover, Mississippi law specifically requires that *the jury* make the necessary culpability findings. *Pinkton v. State*, 491 So. 2d at 308-09. Thus, because state law created an entitlement to have a jury make the required findings, Clyde was also deprived of his due process right under the Fourteenth Amendment. *Clemons v. Mississippi*, 494 U.S. 738, 746 (1990); *Hicks v. Oklahoma*, 447 U.S. 343 (1980).

**B. Juror affidavits also indicate that the jury failed to follow the instructions and the law and did not assess the personal culpability of Clyde**

In capital cases, the Constitution requires that a defendant's punishment be "tailored to his personal responsibility and moral guilt." *Enmund*, 458 U.S. at 801; *see also Tison v. Arizona*, 481 U.S. at 149, 156-57. Thus, any sentence of death cannot be predicated upon the actions of any co-defendants, but rather only upon the actions of the defendant himself. *See Enmund*, 458 U.S. at 798 ("the focus must be on [the defendant's] culpability, not on that of those who… [killed] the victims"); *Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978) (finding that the Constitution requires an individualized consideration regarding whether a sentence of death should be

imposed). Both *Enmund* and *Tison* involved defendants convicted under state felony murder rules. However, as case law makes clear, mere participation in a felony murder while sufficient to support criminal liability, is not alone sufficient to qualify a defendant for a sentence of death. Rather, it is an individual defendant's personal culpability that must be examined in determining whether the defendant may be subject to the death penalty.

In this case, five jurors indicated, when interviewed during postconviction proceedings, that they did not give individualized consideration to the defendants that the Eighth Amendment requires.

Juror George Byrd, Jr., swore:

> There was one verdict for both Clyde Wendell Smith and Jerome Pete Smith at both the guilt and sentencing phases. There was no individual consideration of either Clyde Wendell Smith or Jerome Pete Smith at either the guilt phase or the sentencing phase. We reached our verdict as to both of them together.

PC Ex. 5.

Juror Carolyn Mack swore:

> We decided both defendants together both at the guilt and sentencing phase. We did not decide the verdict either at the guilt phase or sentencing phase individually as to either defendant.

PC Ex. 2.

Juror Mary Ruth Cage swore:

> The jury decided the guilty verdict of Clyde Wendell Smith and Jerome Pete Smith with no individual consideration. The jury decided the sentencing verdict of Clyde Wendell Smith and Jerome Pete Smith with no individual consideration.

PC Ex. 4.

Finally, juror Mary Ann Stanton advise postconviction counsel that she recalled, "the jury deciding both brothers' verdicts together as though it were one verdict." PC Ex. 1.

## IX. Trial counsel were ineffective for failing to object to the prosecutor's misconduct during the penalty phase closing argument, and the jury's verdict, which failed to find Clyde individually death eligible, as required by the Eighth and Fourteenth Amendments

Trial counsel was deficient for failing to object to the prosecutor's misstatement of the law, when he told the jury that their verdict at the guilt phase consisted of a finding that Clyde was eligible for the death penalty under *Edmund* and Mississippi law. Trial counsel were also deficient for failing to object when the jury returned a verdict form indicating that they did not make an individualized finding the Clyde possessed the requisite degree of culpability to be eligible for a death sentence as required by Edmund and Mississippi law. These errors were, individually and cumulatively, prejudicial to Clyde, in violation of his right the effective assistance of counsel under the Sixth and Fourteenth Amendments to the Constitution of the United States. *See Strickland v. Washington,* 466 U.S. 668 (1984).

Clyde presented these claims in postconviction proceedings.

### A. Failure to object to prosecutorial misstatement of the law and argument not based on the evidence

Trial counsel were ineffective for failing to object when the prosecutor incorrectly stated the law on the aggravating factors during the penalty phase. Specifically

referencing the *Edmund* eligibility factors codified in Miss. Code Ann. § 99-19-101(7), the prosecutor told the jury:

> You are to find beyond a reasonable doubt that the defendants actually killed Johnny Smith or that they contemplated that lethal force would be employed. You have already decided that by your verdict.

R/673-74.

Actually, by its verdict, the jury had found, pursuant to Instruction C-3, that the defendants "either individually or acting in concert with one another or others, did unlawfully, willfully and feloniously kill and murder Johnny B. Smith, a human being, at a time when Jerome Pete Smith was engaged in the commission of the crime of Armed Robbery . . . ." They had not found that Clyde Smith had actually killed, intended the killing, or contemplated that lethal force would be employed. *Smith II*, at 394. In light of the State's evidence, they could well have convicted Clyde on a felony-murder theory, believing that Jerome, or the never –apprehended third man, had actually killed the victim. The prosecutor misstated the law.

A prosecutor's misstatement of the law is obviously improper. *E.g., Caldwell v. Mississippi,* 472 U.S. 320, 336 (1985). Counsel's failure to object to and correct the prosecutor's misstatement here was particularly prejudicial, as it essentially told the jurors that the law directed a verdict in favor of the State as to the *Edmund* eligibility factors codified in Miss. Code Ann. § 99-19-101(7).

Trial counsel were also ineffective for failing to object when the prosecutor commented on the seriousness of the prior aggravated assault convictions. This argument was not based on any evidence, but on the prosecutor's personal

knowledge because, "I tried the case." R/697-98. It was completely improper for the prosecutor to assert his personal knowledge is superior to the evidence.

**B. Jury's verdict fails to afford individualized determination that Clyde is death eligible**

Trial counsel were also ineffective when they failed to object to the imposition of a death sentence when the jury's verdict indicated that the jury had failed to find that the evidence proved beyond a reasonable doubt Clyde had actually killed the victim, had intended that the killing take place, or had contemplated that lethal force would be employed. Rather, the jury's verdict found in the affirmative on all three questions as to the "*defendants*," but rendered no finding addressing their finding (if any) as to Clyde's conduct individually. The jury's verdict as to Clyde stated:

> We, the Jury, as to Clyde Wendell Smith, unanimously find from the evidence beyond a reasonable doubt that the following facts existed at the time of the commission of the capital murder:
> 1). That *the defendants* actually killed Johnny Smith
> 2). That *the defendants* intended the killing of Johnny Smith take place
> 3). That *the defendants* contemplated that lethal force would be employed.

C.P. 202.

The use of the plural "defendants," instead of "defendant," indicates that the jury considered the two defendants together and did not individually contemplate whether Clyde actually killed the victim, intended the killing or contemplated the use of deadly force.

Moreover, the jury instructions were ambiguous on this point. Although jurors were told to return a separate verdict form for each defendant, C.P. 269, Instruction S-1 told the jury:

> To return the death penalty in this case you must first unanimously find from the evidence beyond a reasonable doubt that one or more of the following facts existed:
> 1). That the defendants actually killed Johnny Smith
> 2). That the defendants intended the killing of Johnny Smith take place
> 3). That the defendants contemplated that lethal force would be employed

C.P. 265-66. Instruction C-CR-2 told the jury they must consider the punishment and the aggravating and mitigating circumstances to each defendant separately but made no reference to the findings the jury was required to make regarding the *Enmund* factors under Miss. Code Ann. §99-19-101(3)(a) and 99-19-101(7). C.P. 278.

The evidence presented at trial, and the prosecutor's argument, further supports this interpretation. The State's evidence showed that two or three men were at the scene of the victim's death at the Sidon Package Liquor Store. R/233, 253, 308-09, 325, 480-81. The only witnesses to the events outside the store gave uncontradicted testimony that only one individual went into the store. R/334, 337, 343, 346, 352. Kevin Smith identified Jerome as the man who went into the store. R/447, 450. Additionally, it was Jerome who left a fingerprint inside the store. T 459. The prosecutor specifically argued that these witnesses testified "without equivocation" that, "one of those individuals went into the store. Well – and it was the taller, slimmer one, and we know which one that was. It was Jerome." R/565-66.

In light of this evidence, and the State's theory, the jury's finding that, "defendants," which would necessarily include Clyde, actually killed Johnny Smith clearly indicates that the jury did not make the requisite finding as to Clyde's personal culpability required by the Eighth Amendment.

As a result of counsel's deficient performance, Clyde was deprived of fundamental rights under Eighth, Fourteenth Amendments. There is a reasonable probability the but for counsel's failure to object to the fundamentally flawed verdict, Clyde would not have been sentenced to death.

### X. Trial counsel were ineffective for failing to investigate and present mitigating evidence at the penalty phase

Under the ABA Guidelines enacted at the time of Clyde's trial, penalty phase counsel were obligated to conduct a thorough investigation with respect to Clyde's background and mental condition, including obtaining appropriate experts to evaluate Clyde and present relevant testimony at the penalty phase to support mitigation.

Clyde's trial counsel failed to conduct even the most rudimentary investigation into Clyde's life or his social, educational, and psychiatric history. They failed to seek out readily available school and psychological records, failed to interview family members, and failed to seek the assistance of appropriate mental health experts in investigating or presenting mitigating evidence. These combined failures deprived the sentencing jury of vital information about Clyde's background.

Counsel's conduct deprived Clyde of his right to the effective assistance of counsel. *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000); *Strickland v. Washington*, 466 U.S. 668 (1984). As detailed below, the deprivations and tragedies suffered by Clyde surpass those contained in these cases. Readily available evidence could have been presented that would have created a

more accurate and considerably more mitigating picture of Clyde. But for counsels' failure, a life sentence was reasonably probable.

This claim was raised during state postconviction proceedings.

**A. Evidence Presented**

Trial counsel encouraged Clyde to waive the court's offer to complete a "death penalty workup" that would have provided at least some of this information. R/486-87. At the penalty phase they introduced exactly one witness: Clyde's mother, Leola Smith, whose testimony was woefully incomplete, touching on only the most basic facts of Clyde's background. She testified that she and her fourteen-year-old daughter Dot raised Clyde because Clyde's father "took sick" and suffered mental problems requiring commitment to Whitfield a few times each year. R/642. In describing his actions, she testified that he would "run off from home" and "do crazy things." R/644. Crazy things occurring at the home might have been witnessed by Clyde. Id. When Clyde was a bad child, his mother or Dot would "strop" him, but he was mostly a sweet child who helped his mother pay the bills and always hugged her when he came home. R/646. She acknowledged the need to punish Clyde but prayed that the jury would spare him. R/650.

Trial counsel provided no context for this information or explain how it related to Clyde's behavior at the time of the offense. During closing arguments, Clyde's counsel only briefly referred to Leola's testimony "as to his upbringing, the difficulties that the family had, and the fact that in one year she lost three family members dear to her and that that was a tragedy." R/692.

**B. Evidence Not Presented**

Postconviction counsel uncovered the following evidence, which had been readily available at trial.

**i. Clyde's siblings could have described his childhood, which was marked by extreme physical and emotional abuse**

Clyde was the second youngest of nine children. Trial counsel failed to interview all eight siblings about his background—even Dot, who essentially raised Clyde in her parents' absence. Clyde's siblings could have provided a more accurate picture of Clyde's childhood than that presented at trial:

Clyde was born with clubfeet and had to wear braces until he was about seven or eight years old. PC Exs. 7, 8. His siblings described Clyde as a very active child who often got into scrapes despite this disability. Id.

Clyde's father, Elijah, Sr., would "tear[] up the house because he believed things were jumping out at him." PC Ex. 7. In addition to his mental illness, Clyde's father was a "heavy drinker" and alcoholic. PC Exs. 7-9. "When he was drunk he would holler and run the family out of the house." PC Ex. 7. Elijah, Sr., stopped taking his medication used to control his mental illness. Id.

Clyde's siblings describe conditions of abject poverty, noting that even with their mother's jobs, she never earned enough to collect Social Security and lived off SSI. PC Ex. 9. Clyde's father never worked and would "drink up the $50 (disability] check he received each month." PC Exs. 7, 10.

They also describe the family home as extremely chaotic and plagued by violence. Elijah, Sr., beat his children and beat Clyde's mother in their presence—he was "sadistic," and always doing "little evil things." PC Ex. 8, 10. The night Clyde was born, his father "denied that Clyde was his child and grabbed him out of the cradle; [our] mother then took us all out of the house into the fields, but my father followed and forced us back in to the house." PC Ex. 9. He threw hot coffee at one of the children. He whipped Clyde's mother with a belt. PC Ex. 10. He fired a shotgun in the house and threatened Clyde’s mother with the shotgun. Id. This behavior continued until Clyde was almost a teenager. *Id*.

Clyde's father sexually abused his daughters. PC Exs. 7, 9, 10. Clyde was aware of the abuse, which his mother did nothing to stop. PC Exs. 9, 10.

Clyde was exposed at a young age to the violent, criminal behavior of his older brother Sampson—an angry young man five years Clyde's senior. He would describe stealing and killing to Clyde, then in his early teens. Sampson was killed by the Indianola police in 1990. Ex. 9. Clyde's family believed that the police shot Sampson due to a lawsuit he filed against them. PC Exs. 7, 10.

**ii. Clyde's educational records would have provided context about his adolescent behavior**

Trial counsel failed to request and acquire Clyde's school records. PC Exs. 15-16. Clyde consistently struggled scholastically. He repeated the 5th and 7th grades. In the 1984-85 school year, Humphreys County Junior High School promoted Clyde to the 8th grade, but East Columbia High School sent him back to repeat 7th grade. PC Ex.

16. He later repeated the 8th grade. Psycho-educational testing done in 1983 indicated that thirteen-year-old Clyde had an I.Q. of 75 and functioned at the mental age of a nine-year-old. PC Ex. 11. Despite this poor performance, there is no indication that anyone sought to conduct a more comprehensive evaluation or provide educational services to address Clyde's issues.

Postconviction counsel submitted the affidavit of Brenda Aust, Clyde's teacher for both his 5th grade years. She taught at Humphreys County Junior High School from 1975-85. She described a policy of socially promoting poorly performing students and even inflating their grades to ensure promotion. Am. PC Pet., Ex. B.

**iii. Trial counsel failed to investigate Clyde's juvenile history**

As a young teen, Clyde was twice committed to the Columbia Training School of the Mississippi Department of Youth Services, in 1983 (for stealing a car), and in 1984 (for receiving stolen property). PC Ex. 11. There, Clyde was subjected to various forms of abuse including: beatings by house parents; being forced to remain in stress positions and receiving a beating for failing to do so; being humiliated by having food dumped on his head; being forced inside a clothes dryer as punishment; having a tooth broken; being isolated inside a dark room or cell; having his shoulder dislocated by a counselor; and being choked unconscious by a counselor. Ex. 2.

In 2002, the U.S. Department of Justice's Civil Rights Division investigated the Columbia Training School. The investigation revealed evidence of numerous civil rights violations including staff violence and abusive institutional practices, the

unreasonable use of isolation and restraints, and inadequate medical, mental health, and educational services. *Id*.

The Report describes in great detail the abuses and disciplinary practices similar to those that Clyde experienced in 1983 and 1984. Children were "hog-tied," handcuffed, and otherwise restrained; they were put in a windowless isolation cell called "the dark room"; children were hit, slapped, and choked by staff; and children were handcuffed to a pole or placed in stress positions for extended periods. *Id*. As the result of the investigation, the Department of Justice filed suit against the State, alleging the State failed to adequately protect youth from harm (including staff abuse); unreasonably isolated and restrained its wards; failed to provide adequate educational, rehabilitative, medical and mental health services; and failed to provide adequate special education services to disabled youth. The lawsuit resolved via a consent decree in 2005. The Columbia Training School closed in 2008.

**iv. Failure to seek appropriate mental health evaluations**

A rudimentary investigation of Clyde's history would have revealed numerous red flags indicating the need for a mental health evaluation. During state postconviction proceedings, Clyde presented the affidavit of Dr. Julie A. Kriegler, Ph.D., a clinical psychologist, with extensive experience in diagnosing, treating, and researching post-traumatic stress disorder and the effects of early childhood trauma. After a preliminary review of Clyde's records and the affidavits of family members, Dr. Kriegler opined:

> Preliminary information indicates that several factors shaped and influenced Mr. Smith's development and functioning during his childhood and adolescence, including, but not limited to a familiar history of major mental illness, intrafamilial violence, chronic abandonment and neglect, as well as extreme poverty. Trauma occurring early and chronically across an individual's development may have a significant impact on one's neurocognitive, psychological, and social functioning. Indications of this troubled or disordered behavior are found in Mr. Smith's school records where his performance and the descriptions of his behavior are characteristic of a child raised in a traumatic, chaotic household. Descriptions of Mr. Smith's father's alcoholism, and severe mental illness leading to frequent hospitalizations, treatment with psychotropic medications, and bizarre beliefs and behaviors are suggestive of the presence of major mental illnesses that are known to have a familial or genetic component that places subsequent generations at risk for these disorders. . . . Thus, Mr. Smith's troubled behaviors are, to a reasonable degree of psychological certainty, a result of, or explained by a combination of multiple risk factors including major mental illness(es), neuro-cognitive disabilities and the biochemical and neuropsychological impact of early, protracted, trauma.

PC Ex. 17.

**v. Failure to investigate neuro-cognitive defects**

Records of psycho-educational testing indicated that Clyde has an I.Q. of 75. As Dr. Kriegler explained, this is in the "borderline mentally retarded range." PC. Ex. 17. *See also* DSM-IV-TR, at 48. Such evidence is independently mitigating, even if further testing did not indicate that defendant met the diagnostic criteria for intellectual disability. *See, e.g., Williams v. Taylor*, 529 U.S. 362, 396 (2000) (defendant prejudiced by counsel's failure to introduce mitigating evidence, including evidence that defendant was "borderline mentally retarded" and did not advance beyond sixth grade).

This preliminary testing indicated a strong probability that Clyde has significant deficits in executive functioning, which could impair his functioning cause mood instability, impulsivity and agitation. Dr. Marc L. Zimmerman, a clinical psychologist, administered the "Short Category Test," which is "highly effective in uncovering important, but sometimes subtle, deficits that are frequently present in brain damaged individuals." Amended PC Petition – Atkins, Exhibit A at p. 5 (Aug. 12, 2012, Affidavit by Marc L. Zimmerman, PhD). Dr. Zimmerman reports that Clyde's performance on this test indicate "a 75% probability that Mr. Smith has significant deficits in executive functioning." *Id.*

**vi. Failure to investigate personal and familial history of mental illness**

Given Clyde's family history of severe mental illness, and Clyde's own history of erratic behavior, it was unreasonable for counsel to fail to have Clyde evaluated to determine if he too suffers from a mental illness. As Dr. Kriegler observed in her affidavit:

> Descriptions of Mr. Smith's father's alcoholism, and severe mental illness leading to frequent hospitalizations, treatment with psychotropic medications, and bizarre beliefs and behaviors are suggestive of the presence of major mental illnesses that are known to have a familial or genetic component that places subsequent generations at risk for these disorders.

PC Ex. 17, para. 9.

In fact, MDOC records indicate that after Clyde was incarcerated, he was diagnosed with Bipolar Disorder and placed on psychotropic medication to control this illness. Habeas Ex. 3.

Bipolar Disorder is a devastating brain disease involving episodes of mania and depression that last anywhere from several days to several months. Symptoms of mania include elated or irritable mood; inflated self-esteem, ranging from uncritical self-confidence to marked grandiosity, which may reach delusional proportions; decreased need for sleep; distractibility, including the inability to differentiate between the relevant and irrelevant; rapid or pressured speech and/or unusual speech patterns; rapid thinking and

flight of ideas; increased sociability, typically without regard to normal social boundaries; poor judgment and insight, leading to reckless, irresponsible or violent behavior (e.g., indiscriminate buying sprees, sexual indiscretion, drug and/or alcohol abuse, reckless driving, assaultive behavior). American Psychiatric Association, Diagnostic and Statistical Manual, 4th ed., text revision, at 357-59 (2000) (DSM-IV-TR). These episodes may alternate with profound depressions, characterized by pervasive sadness; increased irritability; hopelessness; significantly increased or decreased appetite; insomnia or hyposomnia; disturbances in concentration and drive; and suicidal ideation or attempts. Id. at 349-51.

This disease is biologically based: it is caused by a malfunction in the neurotransmitter system in the brain and is treated with psychotropic medication. DSM-IV-TR at 353, 359-60. It is generally accepted that vulnerability to Bipolar Disorder is largely genetic. Id. at 386. The average age of onset is twenty years old. Id. The practical consequences of untreated or inadequately treated Bipolar Disorder are profound, including:

> [R]ecurrance and intensification of affective episodes that are often accompanied by interpersonal chaos, alcohol and drug abuse, personal anguish and family disruption, financial crisis, conjugal failure, psychiatric hospitalization, suicide, and violence.

Frederick K. Goodwin & Kay Redfield Jamison, *Manic Depressive Illness*, at 746 (1990) (*hereinafter* "Goodwin & Jamison"). However, this disease can be controlled, and its symptoms largely eliminated with the administration of psychotropic drugs.

Counsel's failure to perform even the most rudimentary investigation of the circumstances of Clyde's life left them in no position to make strategic decisions regarding the presentation of mitigating evidence. Counsel failed to uncover readily available evidence that would have supported both statutory and non-statutory mitigating factors and would have lessened the weight of the aggravating factors presented in support of the death sentence. This constituted deficient performance. There is a reasonable probability, had counsel adequately investigated, developed, and presented the available mitigating evidence, Clyde would not have been sentenced to death.

**XI. Trial counsel provided ineffective assistance of counsel for not making a contemporaneous objection that the trial judge erred, in violation of the due process clause of the Fourteenth Amendment, by allowing the jury to be instructed that death could be imposed if aggravating and mitigating circumstances were of equal weight**

By charging the jury that the death penalty should be imposed unless the mitigating circumstances "outweig[hed] or overc[a]me" the aggravating ones, the trial court improperly created a presumption in favor of death, because the death sentence would be required if the jurors found the aggravating and mitigating factors

to be in equipoise. Because of this erroneous instruction, a new sentencing hearing should be required. Trial counsel were ineffective for not preserving this structural error in the jury instructions. *Woodson v. North Carolina,* 428 U.S. 280 (1976).

This claim was raised in state postconviction proceedings.

**XII. Clyde was denied his Sixth Amendment right to effective assistance of conflict-free counsel at trial because his trial attorney, Wallace Stuckey, was acting under the influence of an actual conflict that adversely affected his performance at his trial**

Multiple or dual representation is not “per se violative of constitutional guarantees of effective assistance of counsel." *Holloway v. Arkansas*, 435 U.S. 475, 482 (1978). However, multiple representation resulting in an actual conflict of interest that adversely affects counsel’s performance does violate the Sixth Amendment. As an officer of the court, it is counsel’s responsibility to alert the court to such a conflict. However, the court also has a duty to avoid actual conflicts that it knows about or should know about. *Cuyler v. Sullivan*, 446 U.S. 335 (1980). Under *Sullivan*, *Holloway*, and *Mickens v. Taylor*, 535 U.S. 162 (2002), Clyde’s trial counsel Wallace Stuckey operated under an actual conflict of interest that adversely affected his performance. This was apparent to both Stuckey, subject of the conflict, and to the Honorable Gray Evans, who presided over both trials, appointed Stuckey in both trials, and therefore actually knew about the conflict.

Clyde and Jerome were jointly convicted at two separate felony trials, held nine weeks apart. R-4698/113 (aggravated assault, Apr. 22, 1993); R-22191/221-22 (capital murder, June 30, 1993). Judge Evans presided over both trials. *Id*. In both

cases, Judge Evans appointed counsel to represent each indigent defendant. In Case 4698, on September 22, 1992, Judge Evans appointed Whitman Mounger to represent Clyde (at this point, Jerome had not yet been indicted). R-4698/9. In Case 22191, on November 12, 1992, Judge Evans appointed Mounger and Wallace Stuckey to represent Clyde. R-22191/8-13. When the State amended its 4698 indictment to include charges against Jerome, Judge Evans appointed Stuckey to represent Jerome in that case. R-4698/29. From that point forward (and continuing through direct appeals), Stuckey represented Clyde in Case No. 22191 (the murder case) and Jerome in Case No. 4698 (the aggravated assault case). In both cases, the codefendants' strategies were inconsistent and antagonistic.

**A. Case No. 4698**

As the 4698 appellate court summarized,

> [Jerome] became involved in a verbal confrontation with Lynn Robinson in front of Robinson's residence in Belzoni. [Jerome] left, only to return shortly thereafter accompanied by [Clyde.] The verbal confrontation was renewed and ultimately escalated into a physical encounter joined in progress by Wendell Wright. [Jerome] thereafter devoted his principal efforts to Wright [while] Clyde continued his attention to Robinson.

*See* ECF 53-3.

The assault case opinion clearly indicated that Jerome initiated the altercation with Robinson before seeking Clyde's assistance to settle the matter. Stuckey's defense of Jerome consisted of arguing that Jerome was guilty at the most of merely simple assault (i.e., a fist fight), and painting Clyde as the primary, more culpable aggressor whose use of brass knuckles and a gun elevated the act to aggravated

assault. While cross-examining Wright, Stuckey clarified that Clyde-not Jerome-fired a gun and used brass knuckles during the altercation. Ex. 1 at 25. While cross-examining Robinson, Stuckey again emphasized that Clyde--not Jerome--was the only person to possess a gun or brass knuckles. *Id*. at 44-52. Stuckey emphasized the same points when cross-examining witness Patricia Robinson. *Id*. at 74-76. After the prosecution rested, Stuckey strenuously argued for a directed verdict on behalf of Jerome, stating:

> Jerome was never seen with any brass knuckles. Never seen with a gun.... Further, ... [Jerome n]ever helped in any way with the shooting at Lynn or as a matter of fact with hitting him with brass knuckles, if that happened.... I think the evidence fails wholly on both counts of aggravated assault with respect to [Jerome] as against Lynn Robinson. And, if there is anything with respect to [Jerome] as against Lynn Robinson, it couldn't be more than simple assault which was hitting with his fists.

*Id*. at 87-89. Indeed, when the court noted the evidence against Jerome, Stuckey again shifted responsibility to Clyde:

> Doesn't that presuppose now that Jerome has some idea about Clyde's intent to pull a gun and shoot him and use the brass knuckles? Where is the evidence of that? .... Your honor, still beg to question where is the proof that they were acting in concert with respect to the brass knuckles and the gun.... Admittedly, this is the man who had the words and this is where it started and they jumped on Lynn. Wendell walks out and breaks that up, two against one and that may separate one on one. Now what Clyde does after that is Clyde's problem.... There is no evidence to show that [Jerome] knew what is arguably, if we can just argue about it, what Clyde was going to do.

*Id*. at 89-94. And at the bench trial's closing argument, Stuckey argued:

> I believe that the proof is not sufficient and does not arise beyond a reasonable doubt to connect [Jerome] as an accomplice with Clyde. He was not acting in concert with Clyde. ... It takes something more and

> there is nothing, if it please the Court, to show that Jerome had knowledge that there was any intent on Clyde's part to shot (sic) at anybody or to hit anybody with any brass knucks. Sure, there was a statement made about getting into a fist fight. . . . But there is nothing to indicate that Jerome had knowledge of anything else.

*Id*. at 111-12 (emphasis added). Clyde and Jerome were each convicted of two counts of aggravated assault. Stuckey and Mounger separately appealed Clyde's and Jerome's convictions and sentences. Their representation in these appeals would continue until December 3, 1996, when the Mississippi Court of Appeals affirmed the convictions in part but reversed both men's convictions on the second aggravated assault counts. Ex. 2.

**B. Case No. 22,191**

As the Mississippi Supreme Court summarized in Case No. 22191,

> [Johnny Smith] was killed in the liquor store he owned in Sidon, Mississippi, as a result of three gunshot wounds. . . . [An eyewitness had seen] two black men [that he later identified as Clyde and Jerome] run toward the store. . . . One of the men went into the store and the other stayed outside. . . . A latent print and palm print [found at the scene were] identified as matching [Jerome]. . . . [And two other witnesses saw Jerome with a pistol before and after the incident].

*Smith I*, at 1195.

Clyde's capital trial counsel, likely recognizing the conflict, moved to sever defendants, asserting that defendants had developed inconsistent and antagonistic defenses, which would be prejudicial if tried jointly. R/72, 75. On June 3, 1993, the trial court granted the Motions for Severance. R/21. However, at a subsequent hearing, the trial court, having been informed that Clyde and Jerome disagreed with their respective attorneys, conducted an inquiry into the defendants' desires as to

severance. Both indicated that they wished to be tried together. The trial court rescinded the order granting severance. At the outset of the penalty phase, trial counsel advised the court that it was, "against [counsel's] better judgment that we conduct a joint sentencing trial," but that Clyde desired a joint trial, and asked that Clyde acquiesce on the record. R/627-28.

Clyde's and Jerome's defense strategies clearly conflicted despite their desire to be tried together. Clyde's counsel relied on evidence that Jerome-not Clyde-entered the store and shot Johnny Smith. Jerome's counsel, meanwhile, argued that Jerome was merely "a twenty-year old [who] has got a lot to learn. A man twenty years old-we call him a man-following his older brother." R/682. Jerome's counsel also attempted to minimize his involvement in the aggravated assault of Lynn Robinson because he was "acting together with another person" and that Robinson was a tough "street person" who had not actually been shot. R/640. In his closing argument, Jerome's counsel urged the jury to "consider the level of that prior offense. It involved his brother and he--we both know if somebody gets after somebody with some brass knuckles, we both can't do it and the other part of it was an attempt to shoot." R/681.

In this morass of proceedings and appointments, the following table captures the relevant timelines in the two cases and the period (April 1993 to December 1998) in which Stuckey's simultaneous representation created an actual conflict because he simultaneously owed the duty of loyalty to Clyde (in 22,191) and to Jerome (in 4698):

| **Date** | **Humphreys Case 4698** | | **Leflore Case 22,191** | |
|---|---|---|---|---|
| | **Clyde** | **Jerome** | **Clyde** | **Jerome** |
| 8/27/92 | incident | | | |
| 11/7/92 | | | Incident | |
| 11/12/92 | | | Mounger/**Stuckey appointed** | Gandy/Jones appointed |
| 3/26/93 | Amended indictments | | | |
| 4/5/93 | | **Stuckey appointed** | | |
| 4/23/93 | Convictions, sentencing | | | |
| 6/10/93 | | | State notice of intent to rely on 4698 conviction as aggravator | |
| 6/28/93-7/1/93 | | | Trial, convictions, death sentences | |
| 12/3/96 | Appellate opinions issued | | | |
| 12/10/98 | | | Appellate opinions issued | |

These cases were inextricably linked, not only because they contained the same two codefendants--brothers Clyde and Jerome--but because the assault conviction would be used as an aggravating factor to justify the death penalty in the capital case. In the assault case, Stuckey vehemently painted Clyde as the main perpetrator in contrast to his client Jerome. Stuckey’s capital representation of Clyde was marked by silence as Jerome’s capital counsel parroted Stuckey's exact argument from the earlier case that Clyde was more culpable. During the capital trial, Stuckey still owed a duty of loyalty to Jerome because he was appealing Jerome’s conviction and sentence in the assault case. This constitutes an actual conflict because Clyde's and Jerome’s interests were sufficiently adverse. Clearly, Stuckey's duty of loyalty to Clyde was incompatible with his concurrent duty to Jerome. And although Clyde--against Stuckey's advice--waived his right to sever his capital case from Jerome’s,

nowhere in the capital record is there any evidence that Stuckey discussed his simultaneous representation with Clyde, let alone waived conflicted representation.

This claim was not presented in initial state postconviction proceedings due to postconviction counsels' failure to recognize the violation. Clyde raised the claim in his successive postconviction motion.

## XIII. Clyde's death sentence is based on multiple invalid aggravating circumstances in violation of the Eighth Amendment under *Johnson v. Mississippi*

At Clyde's capital penalty phase, the State established two statutory aggravators making Clyde eligible for the death penalty:

> (b) The defendant was previously convicted of another capital offense or of a felony involving the use or threat of violence to the person.
> . . . .
> (d) The capital offense was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit... any robbery . . . .

Miss. Code Ann. § 99-101-19(5). As to § (5)(d), the State relied upon Clyde's contemporaneous conviction for armed robbery. As to § 5(b), the State relied upon three prior convictions: Humphreys County Case No. 4698 (two counts of aggravated assault: one with brass knuckles, the other with a firearm), and Humphreys County Case No. 4216 (kidnapping). The State specifically argued that each of the prior aggravated assault convictions supported the previous violent felony aggravating factor. R/674. Two of those these prior convictions have been or are due to be vacated. Clyde's jury thus relied upon "materially inaccurate" evidence in the form of the invalid aggravators. Clyde's sentencing calculus having undergone such a dramatic revision, his death sentence is unreliable under *Johnson v. Mississippi*, 486

U.S. 578 (1988) (death sentence violates Eighth Amendment where prior conviction supporting one of the aggravated circumstances was later reversed).

**A. Vacated conviction: Case No. 4698**

At Clyde's penalty phase, the State introduced evidence of Clyde's prior convictions in Case No. 4698 for aggravated assault to prove the "previous-violent-felony" aggravator. This evidence was otherwise irrelevant and inadmissible. Trial counsel unsuccessfully objected to the use of these convictions as aggravating circumstances because they were on appeal, R/621.

After Clyde's capital trial, the aggravated assault conviction based on the use of a firearm was reversed on appeal. Habeas Ex 7. *Clyde Wendell Smith and Jerome "Pete" Smith v. State*, Case No. 93-KA-00586 COA (Miss. Ct. App. December 3, 1996) (unpublished). The Mississippi Court of Appeals vacated this conviction because the State had been improperly allowed to amend the indictment when the State's evidence failed prove that Clyde had willfully discharged a pistol at the victim. *Id.* at p. 3-7.

In his capital direct appeal, the Mississippi Supreme Court found Clyde's death sentence was proportionate, noting that "Clyde had at least three prior convictions for felonies involving violence, including kidnapping and aggravated assault." Id. at 1220.

**B. Conviction without jurisdiction: Case No. 4216**

The trial court also relied upon an invalid kidnapping conviction in Humphreys County Case No. 4216 to find the prior violent felony aggravator. The kidnapping

conviction was invalid because that court lacked subject matter jurisdiction due to Clyde's juvenile status. § 43-21-157,Miss. Code.

Recall the chronology of three incidents occurring when Clyde was still a juvenile (Clyde turned eighteen on November 28, 1987):

1. The June 8, 1986, attempted burglary of Tre's Spot;
2. The September 1, 1986, burglary of the Hodges residence;
3. The December 13, 1986, incident involving Patricia Westbrook.

The Humphreys County Youth Court properly exercised its jurisdiction when it charged Clyde by petition as a delinquent child for the attempted burglary of Tre's Spot in Youth Court File No. 686. Ex. 3. At that time, Mississippi allowed the youth court "in its discretion, [to] transfer jurisdiction of the alleged offense described in the petition... to the criminal court which would have trial jurisdiction of such offense if committed by an adult." § 43-32-1571 (1986). Accordingly, on July 29, 1986, Youth Court Chancellor Nathan P. Adams entered an Order Transferring Jurisdiction over that case to the Circuit Court of Humphreys County and releasing Clyde on his own recognizance to his parents' custody.

While on release, the Hodges and Westbrook incidents occurred. On February 6, 1987, Clyde was arraigned in the Humphreys County Circuit Court, pleading not guilty in three separate cases based upon the incidents described above:

1. Case No. 4161 (burglary of Hodges residence) (Ex. 4);
2. Case No. 4162 (attempted kidnapping of Westbrook) (Ex. 5);
3. Case No. 4163 (attempted burglary of Tre's Spot (formerly Youth Case No. 686) (Ex. 6).

Once jurisdiction has been transferred from youth to circuit court, "the jurisdiction of the youth court over the youth is forever terminated for a delinquent act, except that such jurisdiction is not forever terminated if...a child who has been transferred to the circuit court is not convicted." § 43-21-157(8) (Ex. 7). Therefore, The Humphreys County Circuit Court likewise properly exercised its jurisdiction over these cases.

On February 24, 1987, Clyde, still a juvenile, was convicted in Case No. 4161 while his 4162 and 4163 indictments remained pending. Two short exchanges at that trial marked the court's only mention of Clyde's age. The first occurred during his 4161 arraignment:

> Court: Your name is Clyde Wendell Smith?
> Smith: Yes, sir.
> Court: How old are you?
> Smith: Seventeen.
> Court: Seventeen. Have you been certified [i.e., transferred from youth to
> circuit court]?
> State: It is my understanding that he has, Your Honor.
> Court: Assuming that he has, ....

Ex. 4. The next occurred at Clyde's 4161 sentencing:

> Court: All right, Mr. Smith, the Court investigated your background and although you are a person of tender years, looks like you have had rather an interesting-looking history, and as unfortunate as it is, the Court is going to send you to the penitentiary. So, according to your age, however, the Court is not going to impose the ultimate sentence it could impose.

Ex. 4. A year later, the State re-indicted Clyde for the 1986 incident concerning Patricia Westbrook (formerly 4162). It increased the charge from attempted

kidnapping to kidnapping and created a new case: 4216. On February 19, 1988, Clyde pleaded guilty to kidnapping in Case No. 4162 in exchange for 4163 being "passed to the files." (4162 was also dismissed, but this was mere housekeeping as 4162 charged the same conduct as 4216).

The incidents underlying Circuit Court Case Nos. 4161, 4162/4216, and Youth Court Case Nos. 686/Circuit Court Case No. 4163 all occurred when Clyde was a juvenile. 4163, which was "passed to the files," was the same case that originated in youth court and formed the basis for the transfer of jurisdiction to the circuit court.

Once 4163 was dismissed, the circuit court lost all jurisdiction over all of these cases. See § 43-21-157(8) ("When jurisdiction of an offense is transferred to the circuit court, the jurisdiction of the youth court over the youth is forever terminated for a delinquent act, except that such jurisdiction is not forever terminated . . . if a child who has been transferred to the circuit court is not convicted.").

Clyde was not convicted in Case No. 4163. Instead, that case was dismissed. At the *very moment* the circuit court accepted Clyde's guilty plea in 4216 and dismissed Case No. 4163, it therefore lost jurisdiction over *all* cases. Jurisdiction instead lies with the Humphreys County Youth Court for the three delinquent acts. Because the 4216 court lacked jurisdiction to convict Clyde of kidnapping, the capital sentencing court again relied upon materially inaccurate evidence when sentencing Clyde to death.

The State presented the jury with evidence of three prior violent felony convictions. Two of these have been shown to be invalid: the aggravated assault with

a firearm conviction was later vacated, and the court that convicted Clyde of kidnapping did so without jurisdiction. Only a single aggravated assault conviction remains. Given the complete lack of physical evidence, the State's concession tat Clyde was not the shooter, and the jury's five-hour deliberation, it is probable that but for the jury's consideration of these invalid convictions, Clyde would have been sentenced to life.

Clyde did not raise this issue on direct review or in initial state postconviction proceedings. Clyde raised this claim in his successive postconviction motion.

## XVI. Clyde was denied his rights guaranteed by the Sixth, Eighth and Fourteenth Amendments due to the cumulative effect of the errors at trial

Although each individual claim for relief above would entitle Clyde to relief, he is also entitled to relief due to the cumulative effect of the errors. *See Taylor v. Kentucky*, 436 U.S. 478, 487 n.15 (explaining Court's holding based on "cumulative effect"). The sheer number and types of errors in Clyde's guilt and penalty phase trial, when considered as a whole, severely prejudiced Clyde. While there are means for addressing each individual error, addressing these errors on an individual basis will not afford adequate safeguards required by the Constitution. This matter was raised on direct review and in postconviction proceedings.

## <u>Request for Relief</u>

Wherefore, Petitioner respectfully requests this Court:

a. Issue a writ of habeas corpus ordering that Petitioner be brought before the court to be discharged from his unconstitutional confinement and relieved of his unconstitutional convictions and/or sentence of death;

b. Schedule filing for legal briefs and memoranda in support of the issues of law in this petition so that the Court may be fully informed;

c. Order Respondents to produce the records of state court proceedings together with any responsive pleading deemed just and appropriate;

d. Order such hearings as may be necessary to dispose of respondent's contentions prior to ruling on this petition;

e. Allow for discovery, expansion of the record and an evidentiary hearing as may be necessary to resolve petitioner's claims;

f. Appoint experts essential to litigating petitioner's claims, or provide other necessary financial assistance to petitioner, who is indigent;

g. Grant such other relief as may be appropriate.

Respectfully Submitted,

CHARLES L. PRICHARD, JR.
FEDERAL DEFENDER

/s Marie F. Donnelly
Marie F. Donnelly, Esq.
Chief, Capital Habeas Unit
Assistant Federal Defender
Illinois Bar No. 6277008
Office of the Federal Defender
Middle District of Florida
400 N. Tampa Street, Suite 2625
Tampa, Florida 33602
Tel: 813-228-2715
Email: Marie_Donnelly@fd.org
Secondary Email: FLM_CHU@fd.org

/s David Calder
David Calder
Mississippi Bar No.: 7686
481 Chucky Mullins Drive
Room# 3017
University, MS 38677
Tel: 662-832-1354
Fax: 866-474-0923

Email: davidcalder23@gmail.com

Counsel for the Petitioner